KAISER DEVELOPMENT CO., also known as Kacor Development Corp., a California corporation, Kaiser Hawaii Kai Development Co., a Nevada corporation, Plaintiffs,

and

Richard Lyman, Jr., Matsuo Takabuki, Myron B. Thompson, William S. Richardson, and Henry H. Peters, Jr., Trustees of the Kamehameha Schools/Bishop Estate, Plaintiffs/Intervenors,

v.

CITY AND COUNTY OF HONOLULU, Defendant.

Civ. No. 84–0389.

United States District Court, D. Hawaii.

Sept. 25, 1986.

Jess S. Jackson, Barbara R. Banke, Jackson, Jacobsen and Banke, San Francisco, Cal., for plaintiffs; R. Charles Bocken, Damon Key Char & Bocken, Honolulu, Hawaii, of counsel.

H. Bissell Carey, III, Steven L. Richards, Robinson & Cole, Hartford, Conn., Richard D. Wurdeman, Acting Corp. Counsel, City and County of Honolulu, Honolulu, Hawaii, for defendant.

Anthony Kim, Cheryl Nakamura, Rush Moore Craven Kim & Stricklin, Honolulu, Hawaii, for plaintiffs/intervenors.

## DECISION ON MOTIONS FOR SUMMARY JUDGMENT

SAMUEL P. KING, Senior District Judge.

Plaintiffs Kaiser Development Co. (Kaiser)[1] and plaintiffs/intervenors Bishop Es-

---

1. The named plaintiffs are Kaiser Development Co. and Kaiser Hawaii Kai Development Co. Kaiser Development Co., previously known as

Kacor Development Co., is a California corporation, licensed to do business in Hawaii. Kaiser Hawaii Kai Development Co. is a Nevada corpo-

tate (Bishop)[2] sued defendant City and County of Honolulu (City) for various actions taken by the City affecting a parcel of property known as Queen's Beach, which Kaiser and Bishop had sought to develop. Plaintiffs argued, *inter alia*, that the City's regulations and other actions rise to the level of a "taking" of their property and that the City has engaged in inequitable precondemnation activities for which they are entitled to compensation. The City brought motions for summary judgment against both plaintiffs on all claims. As discussed herein, defendant's motions are GRANTED IN PART and DENIED IN PART, the net result being to dismiss Kaiser from this lawsuit, and to allow Bishop to pursue only its claims for inequitable precondemnation activities.

I

BACKGROUND

A. *Facts*

The Bernice Pauahi Bishop Estate (Bishop) owns approximately 6000 acres situated at Maunalua, in the City and County of Honolulu, on the Island of Oahu. In 1961, Bishop entered into a development agreement with Kaiser Hawaii Kai Development Co. (Kaiser)[3] to develop this land into a new urban community. Much of this new community, Hawaii Kai, is now completed.

The subject of this dispute, however, is a large hotel/resort complex that Kaiser had hoped to build at Queen's Beach, a 210–acre parcel of land at the northeasterly end of Hawaii Kai. Kaiser alleges that it considered this resort its "crown jewel" and economic reward from the vast community development project. According to various affidavits, Kaiser spent over $8 million in building the Hawaii Kai infrastructure "oversized" to accommodate the anticipated development at Queen's Beach. However, Kaiser made no attempt to develop Queen's Beach until 1971.

The 1959 Honolulu City Charter required the adoption of a general plan for the long-range development of the city. Under both the first General Plan of 1960 and a second General Plan of 1964, Queen's Beach was designated as a resort and commercial area. Similarly, in both the 1964 and 1966 Detailed Land Use Maps (DLUMs), which were adopted for numerous areas of Honolulu to accompany the General Plan, Queen's Beach was designated as a resort and commercial area. In 1973, the Revised Charter for the City and County of Honolulu supplanted the previous Charter, and a new General Plan became effective in 1977, which also listed Queen's Beach as a potential resort site. In 1982, however, the City adopted a revised General Plan, which modified the population densities and eliminated Queen's Beach as a future resort site. As required by the 1973 Charter, in 1977, the City began to formulate development plans for all areas of the city, including East Honolulu, the area of Hawaii Kai. In

---

ration, licensed to do business in Hawaii. Plaintiffs refer to themselves collectively as "Kaiser."

This court notes that it was plaintiff Kaiser Hawaii Kai Development Co. that entered into a development agreement with Bishop in 1961 to develop Hawaii Kai. Plaintiffs allege that plaintiff Kaiser Hawaii Kai Development Co. holds the right to develop Queen's Beach for the benefit of Kaiser Development Co., and that Kaiser Development Co. has the right to develop Queen's Beach pursuant to the development agreement. There is nothing in the record indicating the relationship between these two named parties. The court notes only that any rights Kaiser Development Co. may have derive from those of Kaiser Hawaii Kai Development Co. pursuant to its development agreement with Bishop. Kaiser Development Co. does not as-

sert rights independent of Kaiser Hawaii Kai Development Co.

**2.** Plaintiffs/intervenors Lyman, Jr., Takabuki, Thompson, Richardson, and Peters, Jr. are trustees of the Kamehameha Schools/Bishop Estate. The Bishop Estate was established in 1884 by the will of Princess Bernice Pauahi Bishop as a perpetual trust for the education of Native Hawaiians. The corpus of the trust is land originally owned by the Princess. Trust lands, of which Hawaii Kai is a part, comprise about eight percent of the land area in the state and 15.1% of the lands on Oahu. The estate owns 19.6% of Oahu's residential land and 24.43% of Oahu's unimproved residential land. *Hawaii Housing Authority v. Lyman,* 68 Hawaii 54, 66 n. 7, 704 P.2d 888 (1985).

**3.** *See supra* note 1.

1983, the City enacted a new Development Plan for East Honolulu, which changed the previous resort designation on the 1966 DLUM to preservation and park uses.

This litany of plans is made somewhat more confusing by the fact that the *zoning* codes were not updated when new general plans were adopted. From 1960 to 1969, the zoning for Queen's Beach was residential. In 1969, the Comprehensive Zoning Code also zoned Queen's Beach for single family residential homes. This zoning remained in effect until 1984, when it was changed to P–1, or preservation/park.[4]

Kaiser first actively sought to develop Queen's Beach in 1971 when it applied to rezone the property from residential to resort in accordance with the 1964 and 1966 DLUMs. Kaiser later withdrew the request, it alleges, because of confusion engendered by the City's activities to acquire the area as a park. Kaiser did not again seek a zoning change until May 1983. This request was turned down and the denial was upheld by the zoning board of appeals.

Kaiser and Bishop allege, with some support, that the City has been on a mission to acquire the land since 1970. They contend

---

**4.** Article 3 to the Comprehensive Zoning Code of 1978, as revised, provides for the P–1 Preservation District as follows:

Sec. 21–3.1. *Legislative Intent.*

The purpose of creating this district is to establish areas to protect and preserve park lands, wilderness areas, open spaces, beach reserves, scenic areas and historic sites, open ranges, watersheds and water supplies; to conserve fish and wildlife; and to promote forestry and grazing. It is intended that all lands within a preservation district which are under state conservation district jurisdiction shall be governed by the requirements and procedures of Chapter 205, HRS, as amended. (Am.Ord. 3234, 84–42)

Sec. 21–3.2. *Use Regulations.*

Within a P–1 Preservation district, only the following uses and structures shall be permitted:

(a) Principal uses and structures:
(1) Fish hatcheries and fish ponds;
(2) Forests and forestry;
(3) Game preserves;
(4) Private, non-illuminated golf courses, including par–3 but not miniature, with a minimum area of 10 acres;
(5) Open agricultural uses not requiring intensive cultivation, including orchards, vineyards, nurseries, and the raising and grazing of livestock other than swine;
(6) Parks, recreational areas, botanical and zoological gardens, golf courses, marinas and other public buildings and uses;
(7) Public utilities installations and substations; provided that offices or storage or maintenance facilities therefor shall be permitted only as conditional uses;
(8) Watersheds, wells, water reservoirs and water control structures.

(b) Accessory uses and structures;

Uses and structures which are customarily accessory and clearly incidental and subordinate to principal uses and structures; provided that roadside stands for sale of agricultural products shall not be permitted as accessory to agricultural uses in this district; provided further, that in connection with golf courses, accessory uses shall be designed and scaled to meet only the requirements of the members, guests or users of the golf course. Private utilities, including temporary sewage treatment plants, shall also be permitted as accessory uses, provided such use is approved by the Director of Land Utilization. Private utilities so approved shall be permitted notwithstanding the location on a noncontiguous zoning lot or in another zoning district of the principal use or uses served thereby, and paragraph (1) of the definition of "accessory use" in Section 21–1.10 shall be inapplicable thereto.

(c) Conditional uses and structures.

Uses and structures hereinafter specified, subject to compliance with the provisions of part D of Article 2 hereof:
(1) Cemetery, columbarium, crematory, and mausoleum;
(2) Extractive industries, including the removal of sand, rock, soil and gravel;
(3) Private marinas, including facilities for storage and repair of boats and sale of boating supplies and fuel;
(4) Private refuse dumps, sanitary fills and incinerators;
(5) Recreation and amusement facilities of an outdoor nature, other than as specified under permitted principal uses and structures;
(6) Storage or maintenance installations for public utilities;
(7) Television or other broadcasting stations and line-of-sight relay devices;
(8) Private recreational camps;
(9) Private riding academies;
(10) Facilities for movie and television program production.

(d) Special permit uses and structures.

Uses and structures hereinafter specified, subject to compliance with the provisions of part E of Article 2 hereof:
(1) Private vacation cabins;
(2) Temporary structures and uses incidental to land development or building construction. (Am.Ord. 3234, 3906, 4412)

that the City tried to impose unreasonable exactions as a prerequisite for hotel development at Queen's Beach, such as dedication of the oceanfront as a public park; that the City downzoned Queen's Beach and downgraded the density in the area to depress the acquisition price of the land; and that the City's policy has been to freeze development at Queen's Beach until it could be acquired as a park.

## B. *Complaint*

Kaiser's and Bishop Estate's complaints are nearly identical and allege violations of their civil and constitutional rights under 42 U.S.C. § 1983, the Fourteenth Amendment, the Fifth Amendment, and the Contracts Clause. Kaiser alleges that it has property rights in Queen's Beach pursuant to its development agreement with the Bishop Estate. Bishop alleges that it dedicated lands to long term uses in anticipation of realizing rental income from the development of the property under the agreement with Kaiser.

Plaintiffs allege a violation of their due process rights under two takings theories. First, they allege, under principles of inverse condemnation, that the City's wrongful imposition of confiscatory land use regulations deprived them of all economically viable use of their property without just compensation.[5] Second, plaintiffs allege a taking under a "precondemnation blight" theory. They argue that the City's intent all along has been to acquire Queen's Beach as a park, that the City restricted development of the property, attempted to force dedication of a substantial portion of the property, and has otherwise engaged in such inequitable precondemnation activities as to result in "planning blight" for which they are entitled to compensation. *See, e.g., Martino v. Santa Clara Valley Water District,* 703 F.2d 1141, 1147 (9th Cir.1983), *cert. denied,* 464 U.S. 847, 104 S.Ct. 151, 78 L.Ed.2d 141 (1983); *Washington Water & Light Co. v. East Yolo Community Services District,* 120 Cal.App.3d 389, 174 Cal. Rptr. 612, 616–17 (1981); *Taper v. City of*

5. The Supreme Court has noted two theories which could potentially support a claim of "taking" by overregulation. *See, e.g., Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 3116–17, 3122–23, 87 L.Ed.2d 126 (1985). First, a plaintiff may assert that a zoning or other regulation may be so restrictive as to deny him all reasonable beneficial use of his property and thus has the same effect as a taking of the property for public use. Under this theory, such a taking would arguably require payment of just compensation under the fifth amendment.

Alternatively, such a regulation could be viewed as violating the fourteenth amendment. This theory posits that

regulation that goes so far that it has the same effect as a taking by eminent domain is an invalid exercise of the police power, violative of the Due Process Clause of the Fourteenth Amendment. Should the Government wish to accomplish the goals of such regulation, it must proceed through the exercise of its eminent domain power, and, of course, pay just compensation for any property taken. The remedy for a regulation that goes too far, under the due process theory, is not "just compensation," but invalidation of the regulation, and if authorized and appropriate, actual damages.

105 S.Ct. at 3122.

Although the Supreme Court has often referred to regulation that "goes too far," *Pennsyl-*

*vania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), it has never determined whether compensation is constitutionally required in inverse condemnation actions. In fact, the Court has left this issue unanswered four times since 1980. *MacDonald, Sommer & Frates v. Yolo County,* — U.S. —, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986); *Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); *San Diego Gas & Electric Co. v. City of San Diego,* 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981); *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). The Supreme Court will probably face this issue yet again next term. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* — U.S. —, 106 S.Ct. 3292, 92 L.Ed.2d 708 (1986) (probable jurisdiction noted).

Given my disposition of these motions, I need not offer my opinion on the issue today. *But see Lai v. City and County of Honolulu,* Civil No. 78–0355 (D.Hawaii Mar, 21, 1986) [Available on WESTLAW, DCTU database] (findings of facts and conclusions of law awarding damages under the Fifth and Fourteenth amendments on theory of inverse condemnation). *See also Martino v. Santa Clara Valley Water District,* 703 F.2d 1141 (9th Cir.), *cert. denied,* 464 U.S. 847, 104 S.Ct. 151, 78 L.Ed.2d 141 (1983) (indicating probable appropriateness of award of damages for inverse condemnation).

*Long Beach,* 129 Cal.App.3d 590, 181 Cal. Rptr. 169, 176–77 (1982).

Their additional substantive due process claims are that the regulations have deprived them of their "vested property rights" to develop Queen's Beach in accordance with the 1966 DLUM, and that the zoning regulations themselves violate due process.

Their complaint also alleges a violation of their procedural due process rights, that is, a notice and opportunity to be heard on the decision to downzone Queen's Beach.

Finally, Bishop and Kaiser claim that the City's actions have violated their constitutional rights under the Contract Clause.[6]

Kaiser and Bishop pray for just compensation for their various takings claims, consequential damages, and declaratory relief.

## C. *Defendant's Motion for Summary Judgment*

The City makes the following arguments in support of its motions for summary judgment:

—Kaiser does not have a protected property interest in Queen's Beach;

—Kaiser lacks standing;

—Kaiser's and Bishop's claims are not ripe for review;

—Kaiser and Bishop have not been denied substantive due process;

—Kaiser and Bishop have not been denied procedural due process;

—The City's regulations do not violate the fifth amendment because Bishop has already earned a significant return from its Hawaii Kai development; and

—Kaiser and Bishop have not suffered an impairment of contract.

The City recognizes that there are genuine issues of material fact in dispute, particularly as to whether the City engaged in inequitable precondemnation activities and whether there exists any economically viable use to Queen's Beach under the present zoning. The City stresses that it is not seeking summary judgment on these issues, *per se,* but rather that there are other reasons, not involving disputed facts, that entitle it to summary judgment on all counts.

## D. *Applicable Legal Standard*

The standard this court must apply in reviewing the instant motions is well established. Under Fed.R.Civ.P. 56, a motion for summary judgment may only be granted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. The City has the heavy burden of showing the absence of any material facts; the underlying facts must be viewed in the light most favorable to Kaiser and Bishop, and all inferences must be drawn in their favor. *E.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970).

Plaintiffs appear to assert that actions involving land use designations are *per se* unsuitable for resolution by summary judgment. The Ninth Circuit has recently admonished that summary dismissals must be viewed with "particular skepticism" in cases involving inverse condemnation, because a court must often resort to "essentially ad hoc factual inquiries" to determine whether compensation is due. *Hall v. City of Santa Barbara,* 797 F.2d 1493, 1497 (9th Cir.1986). Nevertheless, such a disposition "is not always inappropriate." *Id.* at 1497. There is no special summary judgment standard for inverse condemnation cases. If the City can show the absence of any genuine and material disputes of fact such that plaintiffs, as a matter of law, are not entitled to prevail, this court must grant its motions for summary judgment.

## II

## DOES KAISER HAVE A PROTECTABLE PROPERTY INTEREST?

The City argues that Kaiser does not have a property interest that is protected

---

**6.** Kaiser and Bishop may also be asserting a violation of the Equal Protection Clause. *See* *infra* note 25.

by the Fifth Amendment. Kaiser merely has a contract, which although it concerns land, does not give any constitutionally-protected property rights. The City, if it has harmed Kaiser at all, has merely frustrated Kaiser's contract, but it has not "taken" any property.

In determining whether Kaiser has a property interest that is entitled to protection under the federal constitution, federal courts are not bound by state law. However, federal courts look to state law for aid in determining the scope of property interests. *United States v. 3,035.73 Acres of Land*, 650 F.2d 938, 939–40 (8th Cir. 1981); *Richmond Elks Hall Association. v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330 (9th Cir.1977). In this case, the development agreement itself, decisions by the Hawaii Supreme Court, and federal law all support the City's argument that Kaiser has no protectable property interest.

## A. *Development Agreement*

■ The contours defining "property" are not always clear. The term is used to describe not only a tangible physical thing, but also "the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it." *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). Kaiser argues that there is a trend to allow compensation for any valuable interest, in accordance with fairness and justice, and that the development agreement has given it a "bundle of rights" sufficient to afford it a legally enforceable property interest. These rights, it asserts, include the exclusive right to develop the property, possession of the property, and the right to dispose of the property. Kaiser also asserts that its interest in Queen's Beach has "vested" since it has "selected" Queen's Beach and since it has expended millions of dollars in infrastructure improvement in preparation for development.

A close look at the development agreement shows that Kaiser and Bishop have set up a means by which Bishop can make money from the development of Hawaii Kai without incurring any indebtedness itself. Under the agreement, Bishop owns the land. Kaiser has the "exclusive right," i.e. the first right, to subdivide, develop, and improve the land at its own expense and risk. The agreement specifies that Kaiser has the priority right to lease land to build the first hotel at Hawaii Kai.

Bishop allows Kaiser to access the land, insofar as is necessary for preliminary development and inspection. Kaiser has the right to "select" tracts of land for development. After it has selected tracts, Kaiser prepares subdivision maps and plans, to be approved by Bishop and governmental agencies. After the necessary approvals, Kaiser shall develop the tract in keeping with the plan and shall obtain any necessary approvals.

On the completion of a development, Kaiser is to find lessees for the lots in the tracts. Bishop remains the land owner and the lessor. Bishop executes the leases.

Kaiser recovers its investment, plus a profit for its effort and risk, from lot development payments and rental proceeds, and Bishop receives rentals for the land which Kaiser improves.[7]

Kaiser's assertions misconstrue the development agreement. For example, Kai-

---

7. The Development Agreement also provides, *inter alia*, that:

Bishop is not to lease, transfer, etc. any land without Kaiser's consent. However, if Kaiser does not commence lot development within six months after selecting a tract, Bishop may lease the lot or lots to someone else.

Kaiser may assign or sublet its leased lots or the right to lease the property, with the approval of Bishop.

At the expiration of the agreement, Kaiser shall complete development in selected tracts, but any and all rights in non-selected land cease. Bishop shall try to make arrangements with future lessees to recoup Kaiser's improvement costs.

If any of the land is condemned, Kaiser is entitled to an apportionment for the value of any buildings or other structures on the land and for costs incurred on land that had not yet been leased.

ser does not "possess" the land. Bishop owns the land and remains the landowner and lessor of Kaiser's completed developments; Kaiser has a right of access for development purposes. Nor does Kaiser have the right to "dispose" of the property. At most, it may assign or sublet lots it has leased from Bishop, with Bishop's consent or approval. Nor does Kaiser have any "vested rights" in the Queen's Beach property. Both the development agreement and a subsequent arbitration decision make clear that Kaiser has the right, but not the obligation, to develop property in Hawaii Kai at its own expense and risk.

In addition, Kaiser has not invested any money specifically in Queen's Beach. Even assuming that costs Kaiser has invested in infrastructure elsewhere in Hawaii Kai can be properly allocated to the anticipated development, this investment represents a business risk undertaken by Kaiser. Kaiser cannot turn a contract right into a property right simply by investing in the subject matter of the contract. *Peick v. Pension Benefit Guaranty Corp.*, 724 F.2d 1247, 1275–76 (7th Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984); *see also infra* II.C.

Finally, the very terms of the agreement explicitly state that Kaiser is to have no interest in the lands other than that of a lessee in the lands it leases. Article R of the Development Agreement, describing the relationship between the parties, states:

> This Agreement shall not be construed as creating the relationship of principal and agent between BISHOP and [KAISER], nor as creating a partnership, join venture, or association of any kind between BISHOP and [KAISER], it being the purpose and intent hereof to create only a contract relationship between BISHOP as landowner and [KAISER] as an independent contractor to subdivide, develop and improve The Land. It is contemplated that BISHOP as landowner will issue leases as lessor to the public, and to the extent that [KAISER] takes leases under and pursuant hereto, there shall be the relationship of lessor on the

part of BISHOP and of lessee on the part of [KAISER], but not otherwise.

Similarly, Section F–15 stresses that Bishop is to have all the rights of a lessor under leases made under the agreement, that Bishop remains the owner of leased lots, and that Kaiser "shall have no interest" in leased lots other than those it may acquire as a lessee of particular lots. And in this regard, it should be noted that Kaiser has not even leased Queen's Beach.

In summary, the development agreement affords Kaiser the business opportunity to develop land at Hawaii Kai, including the priority right to lease land to build the first hotel. However, the agreement does not give Kaiser any protectable interest in the property it develops.

### B. State Interpretations of the Development Agreement

The Supreme Court of Hawaii has had three separate occasions to analyze the respective interests of Kaiser and Bishop under their development agreement. The court has thrice determined that the agreement gives Kaiser no property interests.

In *In re Tax Appeal of Kaiser Hawaii-Kai Development Co.*, 52 Hawaii 623, 484 P.2d 138 (1971), the court considered the nature of leased lot payments for tax purposes. The lower court had determined that Bishop and Kaiser had a joint ownership interest in lease rentals received by Bishop. The supreme court however analyzed the development agreement and determined that Kaiser was an independent contractor, not a co-lessor, and had no interest in the lands. Bishop alone, as the exclusive owner and lessor, was entitled to rental payments, but under the agreement, Kaiser derived some money from the lot payments as Bishop's *quid pro quo* for Kaiser's contractual services. The court noted that these facts, as spelled out in the development agreement, "are not changed by Bishop and Hawaii Kai agreeing to deem them to be otherwise." 52 Hawaii at 627, 484 P.2d 138. Thus the court held that Kaiser was required to pay general excise tax on the rental proceeds as gross

receipts derived by it from its contracting business.

In another case involving real property taxes, the court again examined the agreement and found that Bishop remains the lessor of developed lots, retains "rights in respect of matters which have to be approved by it, or as to which mutual agreement has to be reached, and does not relinquish control over the land." *Kaiser Hawaii Kai Development Co. v. Murray,* 49 Hawaii 214, 226, 412 P.2d 925 (1966).

Finally, Kaiser argues that the Hawaii legislature has recognized that a developer, pursuant to a development agreement, has a compensable interest. The Hawaii Land Reform Act, Hawaii Rev.Stat. § 516–26, provides that if the Hawaii Housing Authority condemns land, the fee owner, lessor, and all legal and equitable owners share in the compensation. A developer may also share in the compensation to the extent of his interest as may be determined by agreement. Kaiser asserts that this recognizes its property interest in the land. The Hawaii Supreme Court, however, in a case involving Hawaii Kai, Bishop, and Kaiser, has recently precluded this argument. In *Hawaii Housing Authority v. Lyman,* 68 Hawaii 54, 704 P.2d 888 (1985), the court stressed that Kaiser has no equitable interests in any parcels of lands, and that its rights are defined by the development agreement. Kaiser's rights to any proceeds of the award "necessarily derive from those of [Bishop Estate], since such rights, if they do exist, stem from the development agreement contract." 68 Hawaii at 77, 704 P.2d 888.

In short, the Hawaii Supreme Court has consistently refused to recognize Kaiser's asserted property interest, and the state court's interpretation is entitled to considerable deference in this matter.

C. *Distinction Between Contract and Property Rights for an Inverse Condemnation Analysis*

The constitutional takings analysis has long distinguished between mere contract rights, which are not compensable, and a property interest, which is subject to Fifth and Fourteenth Amendment protection. This distinction has been well developed in *Omnia Commercial Co. v. United States,* 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923), and its progeny.

In *Omnia,* the plaintiff owned a contract which gave it the right to purchase steel plate from a steel company at a price below market. The government requisitioned the steel company's entire production of steel plate for the year and ordered the company not to comply with the contract. The plaintiff alleged a taking. The Court, however, held that there had been no taking. In order for there to be a taking of the contract itself, the government must acquire the obligation or the right to enforce it. The government had taken the *subject matter* of the contract, and the plaintiff had merely suffered a *consequential* loss resulting from lawful government action. The Court noted that the performance of the contract was rendered impossible and that it had not been appropriated, but ended. 261 U.S. at 510–11, 43 S.Ct. at 438.

*T.O.F.C., Inc. v. United States,* 683 F.2d 389, 231 Ct.Cl. 182 (1982), similarly makes the distinction between property and contract rights. In this case, Erie Railroad and T.O.F.C. built facilities for a piggyback loading terminal. Erie took title to the land, and T.O.F.C. was given an exclusive right to operate the facilities. Erie also agreed to pay T.O.F.C. to reimburse it for its investment in the terminals. Erie went bankrupt, and Conrail took over the property but refused to continue the contract with T.O.F.C. T.O.F.C. argued that it had a property interest that had been taken, but the court held, under *Omnia,* that there had been no taking. Erie had owned the land and facilities—T.O.F.C. had essentially had only a service contract for an exclusive right to operate the facility. The court held that the Fifth Amendment compensated only for direct appropriation of property, not for consequential injuries resulting from the lawful exercise of government power. 683 F.2d at 395.

In *PVM Redwood Co. v. United States,* 686 F.2d 1327 (9th Cir.1982), *cert. denied,* 459 U.S. 1106, 103 S.Ct. 731, 74 L.Ed.2d 955 (1983), the Ninth Circuit held that PVM had failed to distinguish between "appropriation of property and the frustration of an enterprise by reason of the exercise of a superior governmental power." 686 F.2d at 1329, *quoting United States v. Grand River Dam Authority,* 363 U.S. 229, 236, 80 S.Ct. 1134, 1138, 4 L.Ed.2d 1186 (1960). PVM operated a sawmill and had alleged that after the passage of the Redwood Park Expansion Act, their redwood suppliers could no longer furnish their needs, causing them an increase in production costs. The court held that what had been frustrated was an expectancy based on past experience that contracts would be entered into.

■ The City cites numerous other cases making this property/contract distinction and stresses that the nature of Kaiser's contract relationship to the property controls the issue. As this court has determined above, Kaiser holds merely the contractual right to construct improvements on the land at Hawaii Kai, including Queen's Beach, and has no separate interest in the property itself. The City's actions may have frustrated the contract between Bishop and Kaiser, but the City has not "taken" any protectable property from Kaiser.[8]

## D. *Does Kaiser Have an Options Contract that Represents a Compensable Property Interest?*

Kaiser asserts, in the alternative, that it has an option to lease Queen's Beach for the purpose of constructing the first hotel,[9] and that this option is a compensable property interest in a condemnation proceeding.

While the general rule is that an option is merely a contract and noncompensable in condemnation,[10] Kaiser argues that there is a significant "trend" toward recognizing an option as a property interest. In the leading case on this issue, *County of San Diego v. Miller,* 13 Cal.3d 684, 532 P.2d 139, 119 Cal.Rptr. 491 (1975), the California Supreme Court reasoned:

> Important changes have occurred in eminent domain law weakening the legal foundation of the Court of Appeal cases denying recovery to the optionee and eroding their authority. [These cases] turned on application of the so-called "property interest-contractual right" test which in turn depended on common law concepts of property....
>
> We do not dispute the technical correctness of the ... conclusion that—ap-

---

**8.** Kaiser cites cases which stand for the proposition that valid contracts are property, and that the taking of a contract requires just compensation. This proposition cannot be disputed. However, in the cited cases, the government had either appropriated the contract itself or had otherwise altered the contract itself. *See, e.g., Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934) (federal government repealed legislation providing for plaintiff's insurance policy); *Larionoff v. United States,* 533 F.2d 1167, 1179–80 (D.C.Cir.1976), *aff'd,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977) (federal government repealed legislation providing for reenlistment bonus); *Hall v. Wisconsin,* 103 U.S. (13 Otto) 5, 26 L.Ed. 302 (1880) (state repealed legislation under which plaintiff had contract for services). Thus, these cases are inapplicable to our situation, which involves a taking of the subject matter of the contract.

Kaiser also argues, citing *Monongahela Navigation Co. v. United States,* 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463 (1893), that its development rights are an integral part of the property taken, and thus are compensable. *Monongahela* involved the value to be paid for condemnation of a series of navigation dams and locks. The Court held that the value should include both the tangible property and an amount for the franchise owned by the company to collect tolls, because the franchise was "not merely a contract in respect of the property taken, but was an integral part of it...." *Omnia,* 261 U.S. at 513, 43 S.Ct. at 439 (distinguishing *Monongahela* ). This case is inapposite, however, as recognized by the Court in *Omnia,* since the government had taken the tangible property of the plaintiff.

**9.** In the event Kaiser takes such a lease, the development agreement specifies an applicable rental formula of a percentage of gross income from the hotel.

**10.** *See, e.g.,* 27 Am.Jur.2d *Eminent Domain* § 255 (1966 and Supp.1985); annot., 85 A.L. R.2d 588 (1962).

**936**

plying traditional common law concepts of property—the option creates in the optionee no estate as such in the land. However, this test is no longer conclusive.

Recent decisions, both of this and of the federal courts, have held the property-contract labelling process is not necessarily determinative in questions of due process compensation. Instead, compensation issues should be decided on considerations of fairness and public policy. "The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness of property law." "[T]he right to compensation is to be determined by whether the condemnation has deprived claimant of a valuable right rather than by whether his right can technically be called an 'estate' or 'interest' in the land."

532 P.2d at 142–43, 119 Cal.Rptr. at 494–95 (citations and emphasis omitted).

The court then examined the expectations of the parties and determined that the optionor had no reasonable expectations of receiving a greater purchase price than the option, and that the optionee expected the benefit of his bargain—that is, to receive any value in excess of the purchase price. The share to the optionee then, should be the excess, if any, of the condemnation award over the purchase price. The court also noted the public policy interests favoring option arrangements.

Hawaii has never directly addressed this issue; however, federal courts in this state have indicated skepticism that Hawaii would recognize an option as a protectable

interest.[11] Moreover, the cases cited by Kaiser in support of its position only recognize that *certain* options are compensable.[12] No jurisdiction has addressed the question whether a bare unexercised option to lease property, which Kaiser asserts that it has, is a compensable property interest.

■ The most fundamental problem in Kaiser's argument, however, is whether Kaiser has an option at all. This court tends to agree with the City that Kaiser has no option, but merely a right of first refusal.

An option to purchase is a contract whereby the owner of the property, for valuable consideration, sells the optionee the right to buy a specified property, for a specified price, within a specified time, and on the terms in the option. The option holder thus may perform or not perform the conditions at his option, has the power to force conveyance of the land, has immunity from revocation or repudiation by the optionor, and may enforce these rights in court. If options contracts do not actually provide the holder with an interest in the land, they do provide considerable value on which the holder can rely. *E.g., Spokane School District v. Parzybok,* 96 Wash.2d 95, 633 P.2d 1324, 1328 (1981).

The *Spokane* court was careful to stress that "[n]ot every option to purchase is necessarily of sufficient value and substance to entitle the holder to participate in a condemnation award." 633 P.2d at 1329. The court noted that here, the option was contained in a lease covenant, there was every reason to suppose the option would

11. In *Windward Partners v. Ariyoshi,* 693 F.2d 928, 929 (1982), *cert. denied,* 461 U.S. 906, 103 S.Ct. 1877, 76 L.Ed.2d 809 (1983), the Ninth Circuit noted in passing: "In any event, Hawaii courts have never recognized an option as a compensable property interest." Similarly, in *In re Continental Properties, Inc.,* 15 B.R. 732 (Bankr.D.Hawaii 1981), the court held that an option conveys no equitable interest in land.

12. Most of the cited cases concern either options to renew held by a lessee in possession, *e.g., Sholom, Inc. v. State Roads Commission,* 246 Md. 688, 229 A.2d 576 (1967); *State ex rel.*

*Morrison v. Carlson,* 83 Ariz. 363, 321 P.2d 1025 (1958); *Department of Public Works and Buildings v. Bohne,* 415 Ill. 253, 113 N.E.2d 319 (1953), or options to purchase, *e.g., Nicholson v. Weaver,* 194 F.2d 804 (9th Cir.1952); *Spokane School District v. Parzybok,* 96 Wash. 2d 95, 633 P.2d 1324 (1981); *Texaco, Inc. v. Commissioner of Transportation,* 34 Conn.Supp. 194, 383 A.2d 1060 (Conn.Super.Ct.1977); *Sholom, Inc. v. State Roads Commission,* 246 Md. 688, 229 A.2d 576 (1967); *County of San Diego v. Miller,* 13 Cal.3d 684, 532 P.2d 139, 119 Cal.Rptr. 491 (1975).

be exercised, the property had increased in value, and the optionee had suffered a definitely measurable loss.

Further, the *Spokane* court and others have recognized that a preemptive right of first refusal creates no interest in property and gives far less than does an options contract. Whereas the option contract gives the power to compel sale, the right of first refusal merely requires the owner to offer it to the holder first, if he decides to sell at all. Thus, one who holds a right of first refusal would not necessarily be entitled to share in a condemnation award. 633 P.2d at 1329, *citing Robroy Land Co. v. Prather,* 95 Wash.2d 66, 622 P.2d 367 (1980). *See also City of Ashland v. Kittle,* 347 S.W.2d 522 (Ky.1961) (mere right of first refusal not a compensable interest).

Turning to the development agreement, Kaiser's interest is more like a right of first refusal than an option to lease. The provision states that Kaiser "shall have the priority right to lease one or more lots for the purpose of constructing the first hotel on the land." The agreement does not give Kaiser the right to compel Bishop to lease a particular piece of property; it is not clear that there was valuable consideration given; and the City points out that Kaiser did not even have a concrete expectation of a leasehold for developing a hotel at Queen's Beach, since the area had never been zoned for resort development.

### E. *Conclusion*

In conclusion, this issue is proper for summary judgment, since there are no triable issues of fact involved in the interpretation of the development agreement between Kaiser and Bishop. I agree with the courts of this state that the development agreement does not give Kaiser a constitutionally-protected interest in Queen's Beach. I also find that Kaiser does not

have an option contract with Bishop, but that even if Kaiser had an option, there is no indication that the Hawaii courts would find it a compensable interest. In short, Kaiser merely has a contract to develop land as a business risk, which has been frustrated, but not taken, by the City's zoning actions.[13]

### III

## DEPRIVATION OF "VESTED" PROPERTY RIGHTS

Kaiser and Bishop allege that they have been denied due process in that they have been deprived their "vested property rights to develop Queen's Beach pursuant to the 1966 DLUM agreement and the City land use regulations prior to 1982." As Bishop states the allegation: "The City first breached and then attempted by passage of restrictive land use regulations to impair its agreement to allow development at Queen's Beach in accordance with the 1966 DLUM."

■ This claim is without merit; plaintiffs have no property rights pursuant to the DLUM or other zoning regulations. First, the DLUM was not a zoning ordinance and did not have the effect of a zoning ordinance. The DLUM was merely a detailed map to implement the general plan. *Nuuanu Neighborhood Association v. Department of Land Utilization,* 63 Hawaii 444, 630 P.2d 107 (1981); Honolulu City and County Ordinance No. 4517 (June 18, 1975).

■ Furthermore, zoning ordinances do not amount to contracts with developers. Courts have held, in light of the broad principle that municipalities cannot barter away their legislative or police power, *United States Trust Co. v. New Jersey,* 431 U.S. 1, 23, 97 S.Ct. 1505, 1518, 52

---

**13.** Because I find that Kaiser has no property interest at Queen's Beach, I need not address the City's argument that Kaiser lacks standing because it has not been injured by the City's actions. However, even if Kaiser did have a property interest at Queen's Beach, summary judgment would have to be granted against Kaiser

on all issues for which it is granted against Bishop. Kaiser's and Bishop's complaints are nearly identical. Except for the fundamental distinction between their property rights, every conclusion in this opinion applies equally to Kaiser as to Bishop.

L.Ed.2d 92 (1977); *Byrd v. Martin, Hopkins, Lemon & Carter, P.C.*, 564 F.Supp. 1425, 1428 (W.D.Va.1983), *aff'd*, 740 F.2d 961 (4th Cir.1984), that municipalities cannot bind themselves with regard to future zoning or other legislative decisions. *E.g., Beckman v. Teaneck Township*, 6 N.J. 530, 79 A.2d 301 (1951); *Louisville v. Fiscal Court of Jefferson County*, 623 S.W.2d 219, 224 (Ky.1981); *Barton v. Atkinson*, 228 Ga. 733, 187 S.E.2d 835, 843 (1972).

Developers may sometimes succeed, however, on a theory of zoning estoppel. *County of Kauai v. Pacific Standard Life Insurance Co.*, 65 Hawaii 318, 653 P.2d 766 (1982), delineates the standards which a developer must meet in order to claim a vested right to a particular land use under an estoppel theory:

> The doctrine of equitable estoppel is based on a change of position on the part of a land developer by substantial expenditure of money in connection with his project reliance, not solely on existing zoning laws or on good faith expectancy that his development will be permitted, but on official assurance on which he has a right to rely that his project has met zoning requirements, that necessary approvals will be forthcoming in due course, and he may safely proceed with the project.

65 Hawaii at 327, 653 P.2d 766, quoting *Life of the Land v. City Council*, 61 Hawaii 390, 453, 606 P.2d 866 (1980).

The *County of Kauai* court held that the "final discretionary action" on the specific project constitutes the "official assurance" for zoning estoppel purposes. 65 Hawaii at 328, 653 P.2d 766. In that case, the developers had secured resort zoning; however, after the zoning code had been amended, a citizens' group succeeded in getting the issue on a referendum ballot. Meanwhile,

the developer obtained a special management area permit and building permits, and had spent considerable money. The court held that the last discretionary act was the special management area permit, but that the certification of the referendum nullified the effect of that permit and the building permits, and thus that the developer had had no right to rely on those permits.

In our case, Bishop and Kaiser never even had the proper zoning in place for their resort development. Thus, Bishop and Kaiser's claim that they had a vested right to assurances that they could develop at Queen's Beach must fail.[14]

## IV

### RIPENESS

The City argues that plaintiffs' claims are not ripe for review. I agree that plaintiffs have failed to meet either of the finality requirements imposed by the recent Supreme Court cases of *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) and *MacDonald, Sommer & Frates v. Yolo County*, — U.S. ——, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986).

In *Williamson County*, the Supreme Court held that "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." 105 S.Ct. at 3117. The Court reasoned that it is simply impossible to evaluate the economic impact of the regulations and the extent to which they interfered with reasonable investment-backed expectations un-

---

14. Bishop appears to misunderstand the limited scope of the City's assertion on this issue. In its memorandum in opposition to summary judgment, Bishop spends considerable time arguing that it need not establish "vested rights" as a precondition to recovery under either their overregulation or inequitable precondemnation activities theories. The City merely argues, and I so hold, that Bishop and Kaiser have no "con-

tract" with the City under the DLUM such that they have a right to develop at Queen's Beach. This does not dispose of their more general takings claims, however. That is, they do not necessarily have to show that they have received the last discretionary assurance in order to make out a potential constitutional takings claim.

til the administrative agency has made a final definitive determination on how it will apply the regulations at issue to the particular land in question. *Id.* at 3119.[15]

In addition, the Court held that a taking claim is not ripe until a plaintiff has sought compensation through state procedures. The Court reasoned that "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Id.* at 3121. The burden is on the plaintiff to show "that the inverse condemnation procedure is unavailable or inadequate, and until it has utilized that procedure, its taking claim is premature." *Id.* at 3122.[16]

In June, the Supreme Court reaffirmed the principles of the *Williamson County* case in *MacDonald, Sommer & Frates v. Yolo County,* —— U.S. ——, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986). In this case, a majority of the Court again avoided the issue of whether a monetary remedy is constitutionally required in inverse condemnation cases involving regulatory takings by holding the claim unripe for review. Reaffirming the principles of *Williamson County,* the Court held that it was unable to determine whether a taking had in fact occurred. Although the developer's initial proposal had been rejected, he had not received a "final definitive position" from the zoning board, leaving open the possibility that some development would be permitted. 106 S.Ct. at 2568. The Court stressed that "[r]ejection of exceedingly grandiose development plans does not logically imply that less ambitious plans will receive similarly unfavorable reviews." *Id.* at 2569 n. 9.[17]

---

**15.** Bishop argues that this finality argument does not apply to its claims under § 1983 because they need not exhaust administrative remedies. The Supreme Court rejected this argument in *Williamson County,* however, explaining that exhaustion and finality were conceptually distinct:

> While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.

105 S.Ct. at 3120.
Thus, claims under § 1983 must also meet the Court's finality requirements.

**16.** The Court held these principles equally applicable whether the claim for inverse condemnation was asserted under the Fifth Amendment Just Compensation Clause or under the Fourteenth Amendment Due Process Clause, *see supra* note 5, because, under either theory, it would be impossible to determine if a regulation had gone "too far" until a final decision was made as to how the regulations would apply to the particular property. 105 S.Ct. at 3122–24.

**17.** The facts in both *Williamson County* and *Yolo County* are instructive for comparison to plaintiffs' position in this case. In *Williamson County,* the plaintiff developer had obtained the planning commission's approval of a preliminary plat for development of a tract based on a 1973 cluster zoning ordinance. Thereupon, the developer spent $3.5 million on a golf course and sewer lines. He then submitted a final plat for approval, several sections of which were given final approval by 1979. The preliminary plat was also reapproved four times during 1973 to 1979. In 1977, the county changed the density limits in the zoning codes; however, the county decided to continue to apply the 1973 zoning regulations to the developer's project and reapproved the preliminary plat in 1978. In 1979, the commission changed its mind and decided to apply the 1977 regulations to the developer's project and asked the developer to submit another plat for approval. The commission denied the approval for numerous reasons. Thereupon, the developer appealed to the zoning board of appeals which determined that the 1973 rules should have been applied. The developer resubmitted the earlier approved preliminary plat, but the commission declined to follow the decision of the appeals board and disapproved the plat for eight different reasons. The developer then filed suit under § 1983 alleging a taking and asserting that the commission should be estopped from denying approval.

The Supreme Court held that the developer's claims were not ripe. The developer had submitted a development plan, which the Court in *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), had held was necessary for a challenge to the application of a zoning ordinance. However, the developer had not sought variances that might have allowed it to develop its property according to its proposed plat, notwithstanding the commission's finding that the proposal did not conform to the zoning

A. *Plaintiffs Have Not Met Received a "Final Determination" on Development at Queen's Beach.*

■ The City argues that plaintiffs have not met either of the *Williamson County* thresholds. First, they assert that plaintiffs have not met the "final definitive position" prong: They have not submitted a development plan under the present land use regulations, which list at least twenty possible uses for the land; they have not applied for a variance; they have not applied for a zoning change.

Plaintiffs counter that they have already received several final rejections of their efforts at Queen's Beach, that they should not be required to beat their heads against a stone wall, and that all further efforts would be futile.[18]

ordinance. The Court noted that the record showed that variances could have been granted for at least several of the violations, and that absent a finding as to *all eight* of the objections, it would be impossible to tell whether the land retained any beneficial use.

The developer argued that it had done "everything possible" to resolve the dispute with the commission, and that the commission's denial of approval was tantamount to a denial of the variances. But the Court was not moved, stating that there was no evidence that the developer had filed for a written request for variances.

The Court also held the developer's claim unripe because he had not sought compensation, or shown that the procedure was unavailable or inadequate, under Tennessee laws that authorized inverse condemnation actions in certain circumstances.

In *Yolo County*, plaintiff sought to subdivide and develop a cornfield, which was zoned for residential use. The developer in this case had submitted a tentative subdivision map to the county planning commission, which the commission rejected because it did not adequately provide for access, sewers, police protection, and water services.

Plaintiff filed suit, accusing the county of effectively restricting the property to open-space agricultural use, despite its zoning, by denying all permit applications and other requests to implement any other use. Plaintiff specifically alleged that none of the beneficial uses allowed even for agricultural land would be suitable for his property, and that any application for a zone change, variance, or other relief would be futile.

The California Superior Court sustained the County's demurrer, finding that the complaint failed to state a cause of action. The court found that, even if the property was restricted to agricultural uses, this did not preclude all development, and beneficial use could be made of the property, such as ranching and farming. Alternatively, the court held that no monetary damages could be awarded for inverse condemnation.

The California Court of Appeals affirmed the trial court on both grounds. In discussing the failure of the complaint to state a cause of action, the court explained:

Here plaintiff applied for approval of a particular and relatively intensive residential development and the application was denied. The denial of that particular plan cannot be equated with a refusal to permit any development, and plaintiff concedes that the property is zoned for residential purposes in the County general plan and zoning ordinance. Land use planning is not an all-or-nothing proposition. A governmental entity is not required to permit a landowner to develop property to [the] full extent he might desire or be charged with an unconstitutional taking of the property. Here, as in *Agins,* the refusal of the defendants to permit the intensive development desired by the landowner does not preclude less intensive, but still valuable development. Accordingly, the complaint fails to state a cause of action.

106 S.Ct. at 2565 (quoting California Court of Appeals opinion).

The Court noted that the findings of both lower courts that there was "no total prohibition against the productive use" of the land left open the possibility that some development might be permitted. *Id.* at 2568 & n. 8. Thus, plaintiff had not received a final definitive determination from the zoning board, and the Court was unable to determine whether a taking had occurred.

In addition, the court noted that the lower courts' findings conflicted with plaintiff's allegations that "any beneficial use" is precluded and that future applications would be futile The Court implied that although futile reapplications for approval were not necessary, a developer had to at least make a meaningful application before a court could determine whether there had been a taking. *Id.* at 2568 n. 8.

**18.** Plaintiffs cite *Kinzli v. City of Santa Cruz,* 539 F.Supp. 887 (N.D.Cal.1982), a pre-*Williamson County* case. In this case, plaintiff sought to develop her land for residential purposes, but delayed the building relying on certain representations by the city. Then the city passed an open space ordinance, and told the plaintiff several times that "no viable private development proposal" would receive city approval and that any application to the city to improve the property would be futile. Plaintiffs alleged that the ordinance permitted no viable economic uses, and that the city had acted intentionally to prohibit all feasible private uses of the land and to maintain it as open space for the public

The record shows that plaintiffs have been involved in an ongoing attempt to develop Queen's Beach as a resort.[19] The majority of their activity, however, has been attempts to influence the drafting of the East Honolulu Development Plan and amendments thereto. Plaintiffs have made only two specific applications for zone

without compensating the fee owner plaintiff. The court held that the claim was ripe because if, as plaintiff had alleged, further applications would be futile, the problems of prematurity and abstractness would be eliminated.

I am not sure, however, that this case would be decided similarly today after *Williamson County* and *Yolo County*, which require a more concrete showing that a final determination has been reached. For example, under the open space ordinance at issue in the case, numerous uses were allowable if a special use permit had been obtained. Under the Court's recent cases, it would seem necessary to see what type of uses remained for the plaintiff's land before a court could evaluate the taking issue.

I admit, though, that these two cases have made the takings inquiry even more complex, since it is difficult to determine when enough is enough, and the property owner can finally come before a court with his claim. Justice White, in his dissent in *Yolo*, bitterly complained that

> [n]othing in our cases ... suggests that the decisionmaker's definitive position may be determined only from explicit denials of property-owner applications for development. Nor do these cases suggest that repeated applications and denials are necessary to pinpoint that position.

106 S.Ct. at 2571.

Justice White, joined by three other members of the Court, saw "no reason for importing such a requirement" into the "final decision" analysis; nor would he require landowners to apply for less intensive development. For example, he would find that a "final decision barring all development" had been made

> if a landowner applies to develop its land in a relatively intensive manner that is consistent with the applicable zoning requirements and if the governmental body denies that application, explaining that all development will be barred under its interpretation of the zoning ordinance, ... even though the landowner did not apply for a less intensive development. Although a landowner must pursue reasonably available avenues that might allow relief, it need not, I believe, take patently fruitless measures.

*Id.* at 2572.

Plaintiffs argue that they have received denials of their Queen's Beach project and that they need not make any more fruitless attempts to secure approval. Perhaps Justice White would find that a final decision had indeed been made at Queen's Beach (although it should be noted that plaintiffs' proposed project here is not consistent with the present zoning at Queen's Beach). Nevertheless, Justice White's com-

ments do not represent the present state of the law.

I note that I am not the first judge to have difficulty applying the *Williamson County* doctrine. *See, e.g., HMK Corp. v. County of Chesterfield,* 616 F.Supp. 667, 671 (E.D.Va.1985). As I have often done in the past, however, I am following the wisdom of Lord Denning who wrote:

> Seek to make your opinions clear at all costs. Make them positive and definite. Not neutral or vacillating. My pupil master told me early on of the client's complaint: "I want your opinion and not your doubts," and of Sir George Jessel's characteristic saying: "I may be wrong and sometimes am, but I am never in doubt."

Lord Denning, *Lord Denning on the Discipline of Law* 7 (1979).

19. The record shows the following efforts by Kaiser in connection with Queen's Beach:

> In 1971, Kaiser applied to change the zoning from residential to resort/commercial, but subsequently withdrew the request. Aff. of Okuda.
>
> In 1981, Kaiser participated in drafting a compromise Development Plan for East Honolulu, which would allow mixed residential and commercial uses at Hawaii Kai. This version was adopted by the city council but vetoed by the mayor. In February and March 1983, Kaiser again suggested resort designation for Queen's Beach in the the Development Plan, but in April 1983, the city council finally enacted the Development Plan, designating Queen's Beach for park and preservation uses. Aff. of Okuda.
>
> In February 1983, Kaiser applied for a residential subdivision at Queen's Beach, which was in conformity with the then existing R–6 zoning. This application was denied on May 19, 1983 after the passage on May 10, 1983 of the East Honolulu Development Plan which designated the area "preservation." Aff. of Fujimoto; aff. of Whalen.
>
> In 1985, in exploring possible settlement of this action, Kaiser put together a new land use plan for its resort at Queen's Beach. Kaiser submitted it as a proposed amendment to the Development Plan. However, in November 1985, the city managing director indicated that the city would reject the proposed plan, primarily because of the pending lawsuit. In December, the chief planning officer rejected the development plan amendment, and in March 1986, the planning commission voted 5–0 against the amendment. Aff. of Davidson.

change or development at Queen's Beach—one in 1971, which they did not follow through on, and one in 1983, which was denied following the adoption of the East Honolulu Development Plan. Plaintiffs have made no attempt to apply for development permits, zoning changes, or variances at Queen's Beach under its present zoning.

Bishop and Kaiser appear to misunderstand the crucial rationale of the finality requirement: The court simply cannot evaluate a regulatory takings claim until plaintiffs have received "a final and authoritative determination of the *type and intensity of development legally permitted on the subject property.*" *Yolo County,* 106 S.Ct. at 2566 (emphasis added). The present P–1 zoning allows many potentially profitable uses.[20] Plaintiffs have made no meaningful application to determine what uses or combinations of uses might be approved at Queen's Beach. As *Agins v. Tiburon, Williamson County,* and *Yolo County* make clear, there is, as yet, simply no "concrete controversy regarding the application of the specific zoning provisions." *Agins,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980).

Further, plaintiffs have made no attempt to alter their vision of a large hotel complex at Queen's Beach. Rejection of plaintiffs' "exceedingly grandiose development plans" at Queen's Beach does not necessarily mean that the land has no reasonable beneficial uses left or that plaintiffs have been denied all reasonable economic value

from their land. *Yolo County,* 106 S.Ct. at 2569 n. 9.[21]

Finally, as the Supreme Court has made clear, mere allegations or opinions by the developer that it has "done everything possible" or that requests for a variance or other relief would be futile will not suffice. *Williamson County,* 105 S.Ct. at 3118, 3120–21; *cf. Yolo County,* 106 S.Ct. at 2564, 2568 n. 8.

B. *Plaintiffs Have Not Sought State Compensation.*

The City also asserts that Kaiser has not met the second prong of the *Williamson County* finality doctrine. That is, Kaiser has not tried to use state procedures to obtain just compensation or shown that such procedures are unavailable or inadequate. 105 S.Ct. at 3122.

On this issue, plaintiffs argue, citing *Allen v. City and County of Honolulu,* 58 Hawaii 432, 571 P.2d 328 (1977), that Hawaii does not allow damages for inverse condemnation. However, *Allen* concerned compensation for zoning estoppel and not regulatory takings. While *Allen* indicates that the state court might generally look on damages for development costs with disfavor, it does not necessarily preclude compensation for Bishop's and Kaiser's claims. Accordingly, until the state has denied them compensation, or until plaintiffs otherwise demonstrate that state compensation is unavailable or inadequate, plaintiffs' claims are not ripe for review by a federal court in a takings action.[22]

20. *See supra* note 4.

21. Kaiser submitted the affidavit of a Mr. William Wanket, who concluded that the following uses had a "reasonable probability of approval" at Queen's Beach: agriculture, private riding academies, private recreation camps, private golf course, cemetery, private utilities, and aquaculture. His opinions, however, including his determination that private vacation cabins would not be allowed, cannot substitute for an explicit determination from the zoning board or the Department of Land Utilization.

In addition, Kaiser submitted an affidavit from a Mr. William Dornbush, who concluded that none of the P–1 zoning uses are economically viable at Queen's Beach. The City readily

admits that there is a significant factual dispute concerning the economic value of Queen's Beach under the present zoning. I believe I do not have to assess the economic viability of particular uses in this case. For the purpose of my determination that the takings issue is unripe, I believe it is sufficient that the present zoning allows many potential uses and that plaintiffs have not submitted *any* application, let alone a "meaningful" one, to develop Queen's Beach consistent with its zoning.

22. The Eighth Circuit has recently reached a similar conclusion. In *Littlefield v. City of Afton,* 785 F.2d 596, 609 (8th Cir.1986), the court held, following *Williamson County,* that plaintiff's takings claim was not ripe because it had not sought compensation from the state. Plain-

## C. The Finality Requirements Do Not Bar Plaintiffs' Claims for Inequitable Precondemnation Activity.

Plaintiffs argue that even if their overregulation claim is barred as unripe, this court must still consider their claim for inequitable precondemnation activity. I agree.

*Williamson County* and *Yolo County* stress that it is impossible for a court to determine whether a particular zoning regulation works a taking when applied to a particular piece of property until a final determination has been made of the various uses that can be made of the property. This is because the takings inquiry examines whether there is any reasonable economic value left to the property at issue. An analysis of beneficial uses is irrelevant, however, to a claim for inequitable precondemnation activities.

In *Martino v. Santa Clara Valley Water District,* 703 F.2d 1141, 1147 (9th Cir. 1983), *cert. denied,* 464 U.S. 847, 104 S.Ct. 151, 78 L.Ed.2d 141 (1983), the Ninth Circuit held that the failure to submit a development plan did not bar a claim that unreasonable delays or other unreasonable conduct in the condemnation process effectively resulted in a taking.[23] Thus Bishop may

proceed with its allegations that the City's conduct concerning Queen's Beach was "so unreasonable as to result in 'planning blight' for which [they] may be entitled to compensation." *Id.*

### V

### SUBSTANTIVE DUE PROCESS

Bishop and Kaiser appear to argue that the zoning laws on their face violate their rights to substantive due process.[24] The test for substantive due process in analyzing social and economic regulations, such as the zoning regulations at issue here, is whether the regulations are rationally related to a legitimate state interest. *Williamson v. Lee Optical,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). The zoning carries with it a "presumption of rationality that can only be overcome by a clear showing or arbitrariness and irrationality." *Hodel v. Indiana,* 452 U.S. 314, 331–32, 101 S.Ct. 2376, 2386–87, 69 L.Ed.2d 40 (1981). This court is neither a super legislature, nor a zoning board of appeal, and it is not my function to pass on the wisdom or appropriateness of the regulations. *See Construction Industry Association v. City of Petaluma,* 522 F.2d 897, 906 (9th Cir.1975),

---

tiff had argued that a state supreme court case barred recovery for inverse condemnation. However, the Eighth Circuit held that the state court's holding merely limited the use of inverse condemnation damages to cases where injunctive relief would be inadequate. Thus the state court decision did not foreclose such an action. Until the state court had ruled that an inverse condemnation action could not be brought or had denied them compensation, the plaintiff's claim was not ripe for review by a federal court.

**23.** While *Martino* was decided prior to *Williamson County* and *Yolo County,* its rationale still applies. The Ninth Circuit's decision was grounded in *Agins,* which held plaintiff's taking claim premature for failure to submit a development plan. Like the Court's more recent pronouncements, *Agins* requires a concrete determination of uses so that a court may assess the reasonable value of the property under the regulations.

**24.** *Yolo County* and *Williamson County* focused on whether zoning regulations *as applied* to a particular parcel constituted a taking either un-

der the Fifth Amendment or as an abuse of police power that violated the Fourteenth Amendment guaranty of due process. These cases do not preclude a claim that the regulations are arbitrary and capricious and thus that the regulations themselves violate due process.

At first blush, it might appear that Kaiser would have standing to challenge the regulations on their face, under *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). In that case, the plaintiff, a non-profit developer, contracted to build low-income housing on land owned by a religious order. Under their agreement, the developer became the immediate lessee and in addition had a contract of sale contingent on securing zoning clearances. The Court held that the plaintiff had standing to assert due process rights even though it was not the property owner. By contrast, both the development agreement between Kaiser and Bishop, and state court decisions make clear that Kaiser merely has a contractual development interest and no property interest. Kaiser has not even acquired the interests of a lessee at Queen's Beach.

cert. denied, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976).

■ This court must give considerable deference to the interests pursued by the legislature in passing zoning laws. Zoning ordinances must be upheld unless they are "clearly arbitrary and unreasonable, having no substantial relationship to the public health, safety, morals, or general welfare." *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926). Courts have given legislatures wide latitude in defining what is best for the community. Thus the legislature, under the guise of the "general welfare" may pass ordinances to preserve spiritual, physical, and aesthetic values, *Berman v. Parker*, 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954), to "enhance the quality of life," *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 129, 98 S.Ct. 2646, 2661, 57 L.Ed.2d 631 (1978), and to create zones where "the blessings of quiet seclusion and clean air make the area a sanctuary for people." *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974).

The City has supplied a substantial analytical report prepared by Michael Fischer, of Sedway, Cook & Associates, a planning firm, that concludes that the general plan, development plans, and the zoning, both in general and as applied at Queen's Beach, "bear a substantial relation to and rationally seek to promote the health, safety, and general welfare" of the people of Honolulu.

Bishop has not submitted any evidence to the contrary, but instead argues that the report is self-serving and that the issue of the legislative goals must be resolved on a more complete factual record, *e.g.*, on the basis of actual testimony or legislative reports and findings as to the need for the legislation.

Although a more complete legislative record would help this court to determine the legislative concerns, the absence of such material does not preclude my finding that the zoning regulations affecting Queen's Beach are rationally tied to a valid goal. *See, e.g., Rogin v. Bensalem Township*, 616 F.2d 680 (3d Cir.1980), *cert. denied*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981) (holding that the complaint does not state a cause of action for denial of due process or equal protection). My inquiry, under the extremely deferential due process review, is at an end if I find that the legislature rationally could have concluded that their goal was in the best interest of the people of Honolulu, and that the legislature could have determined that the regulations were a reasonable means to promote its objective. *Rogin v. Bensalem Township*, 616 F.2d at 688–89; *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 242, 104 S.Ct. 2321, 2330, 81 L.Ed.2d 186 (1984) (analyzing the "public use" requirement of the Fifth Amendment under a "rational basis" analysis); *United States v. Locke*, 471 U.S. 84, 105 S.Ct. 1785, 1800, 85 L.Ed.2d 64 (1985).

■ Given my limited role in reviewing the legislation at issue, I have no problem finding that all of the zoning and land use regulations at issue are rationally related to legitimate planning goals. The DLUMs, General Plans, East Honolulu Development Plan and its amendments were concerned with such legitimate planning concerns as housing, transportation, commercial and economic growth, preservation of open space, and preservation of environmental and historical areas. For example, the stated legislative intent of the P–1 Preservation District is to

> establish areas to protect and preserve park lands, wilderness areas, open spaces, beach reserves, scenic areas and historic sites, open ranges, watersheds and water supplies; to conserve fish and wildlife; and to promote forestry and grazing.

Comprehensive Zoning Code of 1978, as amended, art. 3, sec. 21–3.1.

The plans and zoning scheme that were eventually enacted may not in fact have been the best means of achieving the legislative aims, but the legislature certainly

could have concluded that they were a reasonable means to their ends.

This determination of course only addresses Bishop's claim that the regulations themselves deny them substantive due process. This does not dispose of the allegation that they were denied due process because the city misused its zoning power by employing inequitable precondemnation procedures.[25]

## VI

### PROCEDURAL DUE PROCESS

In their complaints, plaintiffs assert that they have been denied procedural due process because the City has *de facto* taken their property interests without affording them procedural due process.[26] The City argues that plaintiffs are not entitled to procedural due process protection because in passing zoning regulations the City was acting in a legislative, as opposed to an administrative, capacity.

The Supreme Court and lower courts have long distinguished between administrative and legislative action, because our theory of government assumes that people are assured input into the legislative process which seeks to balance the varied interests of society at large. Administrative actions, on the other hand, are those that affect only one or a few people and are case-by-case, so they do not involve a relatively large number of affected people to guard against unreasonable government action. As Justice Holmes observed in *Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915):

> Where a rule of conduct applies to more than a few people, it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.... There must be a limit to individual argument in such matters if government is to go on.

Many courts, including the Ninth Circuit and the Supreme Court, have held that the enactment of a general zoning ordinance is a legislative act. *Eastlake v. Forest City Enterprises*, 426 U.S. 668, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976); *Ebel v. City of Corona*, 698 F.2d 390 (9th Cir.1983); *Rogin v. Bensalem Township*, 616 F.2d 680, 693 (3d Cir.1980), *cert. denied*, 450 U.S. 1029, 101

25. Although neither plaintiff states an equal protection claim in their complaints, Kaiser argued in their briefs and at the hearing that the City violated their rights to equal protection. They claim that the City's rules were "applied differently" to Queen's Beach in the designation and zoning of the parcel, in the denial of their zoning application, and by the imposition of unreasonable exactions. They argue that this treatment was "discriminatory" and compensable under both due process and equal protection principles. I assume that Bishop is also making this assertion, although the record is unclear.

Bishop undeniably has the "right to be free of arbitrary or irrational zoning actions." *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977). Absent allegations that the regulations involve a suspect classification, a court applies the traditional rational basis standard in reviewing legislation for equal protection violations. To prevail on this claim, Bishop must prove that the zoning regulations and their application "so lack rationality that they constitute a constitutionally impermissible denial of equal protection." *City of New Orleans v. Dukes*, 427 U.S. 297, 305, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). As I have already found, however, the zoning regulations bear a rational relationship to legitimate planning objectives. The City's motion on this part of the equal protection issue must therefore be granted.

26. Plaintiffs also allege that they have been denied procedural due process in that the City has deprived them of their "vested property rights to develop Queen's Beach pursuant to the 1966 DLUM agreement and the City land use regulations pursuant to 1982." This claim is addressed *infra* section VIII under the discussion of plaintiffs' Contract Clause claims.

S.Ct. 1737, 68 L.Ed.2d 223 (1981).[27] Similarly, the Hawaii Supreme Court held that the enactment of and amendments to the General Plan or DLUMs constitute legislative process. *Kailua Community Council v. City and County of Honolulu,* 60 Hawaii 428, 591 P.2d 602 (1979) (holding the Hawaii Administrative Procedures Act inapplicable to actions by the city council and chief planning officer).

■ The general plans, DLUMs, and zoning codes at issue here were all enacted by ordinances. They "constitute general statements of [City] policy rather than specific applications of policy to a particular landowner, and therefore can be characterized only as legislative acts" to which Bishop may not claim any procedural rights. *Rogin v. Bensalem Township,* 616 F.2d at 693.[28]

Bishop argues that the regulations more severely burden them than other landowners. This claim is irrelevant. The mere fact that general zoning regulations may have a differential impact on Bishop does not entitle them to procedural safeguards where none are due. Our democratic system is founded on compromise and decisionmaking that is intended to produce the most equitable results overall. Our system would simply fall apart if every person disgruntled by a general law or regulation could claim rights to procedural due process.

In contrast to the legislative enactment of zoning ordinances or general plans, city activity involving specific building permits or variances is administrative in nature

since it involves the application of zoning regulations to a specific parcel of property. However, Bishop has not alleged any procedural due process violations with respect to the denial of building permits or specific variance requests.

Bishop also asserts that it is entitled to procedural safeguards, not just with respect to the actual zoning regulations, but with respect to all of the City's activities at Queen's Beach. These claims are appropriately considered under Bishop's cause of action for inequitable precondemnation activity.

## VII

## BISHOP HAS ALREADY RECEIVED SIGNIFICANT MONETARY GAINS

■ The City argues that even if Bishop's claims were ripe it still would not be entitled to any compensation for its losses at Queen's Beach. The City argues that the taking inquiry asks whether "justice and fairness" require that the public at large, rather than the individual property owner, bear the burden of government regulation. *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124–25, 98 S.Ct. 2646, 2659–60, 57 L.Ed.2d 631; *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980). The City argues that, in determining whether there has been a taking, a court should measure a landowner's interest in the whole parcel, not in an isolated tract that he may not be able to develop as he would wish. Under this view, Kaiser asserts, Bishop has al-

---

27. Bishop has cited one case from an Illinois federal district court that, noting that it was very difficult to distinguish between legislative and administrative process in zoning actions, held that intervenors in a zoning action were entitled to some due process. Ultimately, the court held that they were not deprived of due process because they had a full hearing in court on the merits of their objections to the rezoning at issue. *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 469 F.Supp. 836, 858–862 (N.D.Ill.1979), *aff'd,* 616 F.2d 1006 (7th Cir.1980).

This case is clearly distinguishable from ours. In *Arlington Heights,* the board did not follow

its normal zoning and annexation procedures and instead entered into negotiations for a consent decree. Additionally, the zone change involved only one specific piece of property; it was not part of widely applicable zoning ordinances or plans, as are the regulations at issue here.

28. Bishop argues that the decision to downzone Queen's Beach involved a specific parcel of land, and so the safeguard of legislative action was not present. However, this downzoning came as part of a development plan for all of east Honolulu and a comprehensive zoning code, and thus did affect the general populace.

ready received enough money from the development at Hawaii Kai generally that the City's actions at Queen's Beach do not deny it the economically viable use of its land or "interfere with reasonable investment-backed expectations." *Williamson County*, 105 S.Ct. at 3119.

The City draws from a number of cases to support its contentions. In the *Penn Central* case, the Supreme Court held:

> "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole.

*Penn Central Transportation Co.*, 438 U.S. at 130, 98 S.Ct. at 2662.

The Ninth Circuit has also recognized that a court must focus on the property as a whole. In *MacLeod v. Santa Clara County*, 749 F.2d 541, 547 (9th Cir.1984), *cert. denied*, 472 U.S. 1009, 105 S.Ct. 2705, 86 L.Ed.2d 721 (1985), the court noted that the Supreme Court has

> long since rejected any contention that denial of the use of a portion of a parcel of property is so bound up with the in-

vestment-backed expectations of a claimant that government deprivation of the rights to use a portion of the property in issue invariably constitutes a taking, irrespective of the impact of the restriction on the value of the parcel as a whole.

This recitation of the doctrine only takes the City so far, however. The takings question is an inherently fact-based inquiry. The determination whether to treat land as a single parcel for determining its value depends on numerous factors, such as unity of use, contiguity, physical characteristics, historical considerations, and how the land has been treated both by the landowner and by the government.

The cases cited by the City are distinguishable from Bishop's situation.[29] Here, the primary factor supporting the single parcel theory is that Bishop owns the property as a whole. However, Queen's Beach is non-contiguous since it is separated from the rest of Hawaii Kai by a road; Queen's Beach has not been developed by Bishop as part of the residential community of Hawaii Kai; Bishop and Kaiser have always considered Queen's Beach a separate area on which they seek to build a resort. Most importantly, the City has treated Queen's Beach separately for zoning and planning purposes.[30] The City has zoned Queen's

---

**29.** In *Penn Central Transportation Co.*, 438 U.S. at 104, 98 S.Ct. at 2649, the Supreme Court held that "air rights" above a piece of property do not constitute a separate property interest.

In *MacLeod v. Santa Clara County*, 749 F.2d 541 (9th Cir.1984), *cert. denied*, 472 U.S. 1009, 105 S.Ct. 2705, 86 L.Ed.2d 721 (1985), the plaintiff bought a single parcel of land, consisting of two ranches. He continued the historic use of the property by leasing it out in its entirety for cattle grazing. Subsequently he entered into an agreement with a lumber company to harvest timber on the property, but the county denied his application for a use permit. The Ninth Circuit recited the *Penn Central* rule, but did not seem to apply it. Instead it found that the denial of a permit to harvest timber did not interfere with the two present and primary uses of the property—grazing and investment—and thus that it did not interfere with his primary investment-backed expectations concerning the use of the property. 749 F.2d at 547.

In *Deltona Corp v. United States*, 657 F.2d 1184, 228 Ct.Cl. 476, (1981), *cert. denied*, 455

U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982), the court held that the plaintiff had not been deprived of the economically viable use of his land because he had been able to develop over 80% of it and had doubled the market value of the property. In this case, however, plaintiff bought a 10,000 acre parcel in the Florida Gulf for development into a water-oriented residential community. The master plan called for a wholly-integrated community of homes, shops, schools and parks, but for development purposes, the plaintiff had divided his land into five construction areas which were to be built consecutively. Plaintiff was granted permits for three of the development areas, but was subsequently denied permits for the remaining two because of stricter federal environmental laws.

**30.** In this regard, Bishop is in a similar situation to the plaintiff in *American Savings and Loan Association v. County of Marin*, 653 F.2d 364 (9th Cir.1981). In this case, which was decided before *MacLeod*, the plaintiff owned the "Point" and the "Spit," two contiguous parcels of prop-

Beach for preservation uses, while most of the rest of Hawaii Kai is zoned residential, and Queen's Beach has consistently had a different land use designation from the rest of Hawaii Kai. Under the General Plans of 1960 and 1964, under the DLUMs of 1964 and 1966, under the 1973 revised City Charter, and under the 1983 Development Plan, for example, Queen's Beach has been designated either commercial/resort or park/preservation, while the rest of Hawaii Kai has been designated primarily for residential use. In summary, under the facts of this case, Queen's Beach is to be considered a separate parcel for the purposes of determining whether there has been a taking.

## VIII

## CONTRACT CLAUSE

Plaintiffs allege that the 1982 amendments to the General Plan, the enactment of the East Honolulu Development Plan, the withdrawal of the right to build a resort at Queen's Beach, and other acts of the City have violated their constitutional rights under the Contract Clause.[31] They argue first that the City has acted to impair the obligation of Bishop's contract with Kaiser for the development of Queen's Beach, and second, that the City has acted to impair its own contractual obligations to Kaiser and Bishop pursuant to the DLUM agreement. Neither of these claims has merit.

The Contract Clause provides that: "No State shall ... pass any ... Law impairing the Obligations of Contracts." U.S. Const. art. 1, § 10. The Supreme Court has set out a three-part test for determining whether a state's (or subdivision's) regula-

tions work such an impairment. The threshold inquiry is whether the law has operated as a substantial impairment of a contractual relationship. If so, then a court determines whether there is a significant and legitimate public purpose behind the regulation and whether the adjustment of the rights and responsibilities of the contract is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the regulation. Where the contract involves the state, the court must scrutinize the purpose more carefully. Where, as here, the contract only involves private parties and the legislation involves social or economic welfare, the court defers to the legislative judgment as to the necessity and reasonableness of the measure. *See, e.g., Energy Reserves Group Inc. v. Kansas Power and Light,* 459 U.S. 400, 410–13, 103 S.Ct. 697, 703–05, 74 L.Ed.2d 569 (1983); *Allied Structural Steel Co. v. Spannous,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978); *Troy Ltd. v. Renna,* 727 F.2d 287, 296–98 (3d Cir.1984).

■ The City argues that plaintiffs cannot get past the first step because the regulations have not acted on the contract to adjust the rights and responsibilities of Kaiser and Bishop. In order to have a constitutionally protected impairment, the law has to act on the contract itself, as distinguished from the subject matter of the contract. An otherwise valid law is not unconstitutional merely because an object of regulation is also the subject of a contract. *South Terminal Corp. v. Environmental Protection Agency,* 504 F.2d 646, 680 (1st Cir.1974).

---

erty. The city council determined that the county should keep the Spit permanently as open space, and the county general plan incorporated this concept. Further, the county zoned the Spit separately for very low density housing, while the Point was zoned for higher density housing. The Ninth Circuit never actually determined whether the Point and the Spit should be considered one parcel, but it noted that the differential zoning tended to require their separate evaluation for takings purposes. The court also noted that a key consideration would be

whether the parcels would be treated separately at the development stage by the plaintiff and the county, but that it could not determine this yet because the plaintiff had not submitted a development plan. 653 F.2d at 371.

**31.** The fact that Kaiser does not have a property interest at Queen's Beach does not preclude it from asserting its contract clause claims, which are based on its Development Agreement with Bishop.

It appears that plaintiffs have confused impairment of the performance of their development agreement with impairment of the obligation of the contract. As one court has explained,

> The contract clause of the federal Constitution does not bar all governmental action affecting profitability of private contracts, even where the effect of such action is to diminish the likelihood that one or more of the parties will keep their bargain. Rather, the clause forbids an alteration in the relative position of two parties to an existing contract.

*Metropolitan St. Louis Sewer District v. Ruckelshaus,* 590 F.Supp. 385, 389 (E.D. Mo.1984). *See also South Terminal Corp.,* 504 F.2d at 679–80; *Jackson Sawmill Co. v. United States,* 580 F.2d 302, 311–12 (8th Cir.1978).

■ As the City points out, the zoning regulations did not alter the terms of the contract between Bishop and Kaiser, but simply affected the uses which could be made of Queen's Beach. Thus the regulations only affect the property which is the subject matter of the contract. Kaiser still has the contractual rights to develop at Hawaii Kai, if it can get the necessary approvals; Bishop still has the obligation to allow the development; the financial arrangements between the parties remain unchanged. Indeed, the City's actions may have made performance of the contract less profitable and less likely, but this gives rise only to an action between the parties for breach of contract—not a constitutional claim.

Plaintiffs' second claim is that the City has acted to impair its own contractual obligations to Bishop and Kaiser pursuant to the DLUM to allow them to develop a resort at Queen's Beach. As has been discussed, however, the DLUM was not the equivalent of a zoning ordinance, and moreover, zoning ordinances are not contracts with developers. It is simply not within the City's power to contract away essential police powers, such as the ability to make future zoning decisions. The City had no contractual obligations with Kaiser or Bishop in this regard.

## CONCLUSION

In conclusion, the City's motions for summary judgment are granted against Bishop and Kaiser on all causes of action except for Bishop's claims concerning inequitable precondemnation activities.

Specifically, I find that Kaiser does not have a property interest in Queen's Beach; that plaintiffs do not have any vested rights to development at Queen's Beach; that plaintiffs' claims are not ripe for review under *Williamson County;* that none of the regulations or plans at issue violate due process or equal protection on their face; that plaintiffs are not entitled to procedural due process; and that the City has not violated the guaranties of the Contract Clause.

An appropriate order shall be submitted to the court by defendant through plaintiffs and plaintiffs/intervenors. In the event that the parties are not able to agree upon the form of the order, a conference to settle the order will be held upon request.