# SHOLOM, INC. *v.* STATE ROADS COMMISSION OF MARYLAND, ET AL.

[No. 239, September Term, 1966.]

*Decided May 15, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES and McWILLIAMS, JJ.

*Frank P. Flury,* with whom were *Flury & McLaughlin* on the brief for appellant.

*Charles J. Sullivan, Jr., Special Attorney,* with whom were *Francis B. Burch, Attorney General, Joseph D. Buscher, Special Assistant Attorney General,* and *Carl H. Lehmann, Jr., Special Attorney,* on the brief for State Roads Commission of Maryland, part of appellees; *William H. McCullough,* with whom were *McCullough & Pace* on the brief for Estate of Harry Armstrong, et al., other appellee.

McWILLIAMS, J., delivered the opinion of the Court.

In this condemnation proceeding the appellee (Commission) seeks to acquire the leasehold interest of the appellant (Sholom) in property belonging to appellee (Armstrong) lying at the intersection of Central Avenue and Capital Beltway in Prince George's County. The trial judge held that because Sholom had not exercised options to extend its lease for two additional five year terms, its compensable interest must be restricted to the residue (16 months) of the first 5 year term. Sholom also had an option to buy during the first 5 year term. Because it had not exercised its option the trial judge refused to allow Sholom's testimony as to the value of the land. Availing themselves of the provisions of Maryland Rule 826 g the parties have filed a statement of the case in lieu of pleadings and evidence. The relevant facts, as gleaned from that statement, are as follows:

The entire tract, zoned for commercial purposes, was divided by Brightseat Road (Old County Road) and enjoyed frontage on both sides of Brightseat Road and on the north side of Central Avenue. The taking by the Commission consists of the two cross-hatched parcels (Parcel No. 1 and Parcel No. 2) and the "easement area" shown on the plat made a part of this opinion.

> "The * * * [area] on the east corner of Brightseat Road was improved by a building housing a combination tavern, package liquor store and grocery store. The * * * [area] on the west corner of Brightseat Road was unimproved, and used for additional parking. The building faced Central Avenue and had two entrances, both fronting on Central Avenue. There was

parking space for cars all along the front of the building on Central Avenue, and along the side of the building on the east side of Brightseat Road."

* * *

"The taking of the strip on Central Avenue resulted in a complete denial of access to the property from Central Avenue.

"The Commission also relocated Brightseat Road further west, so that it intersects Central Avenue west of the Armstrong property. The only way in which the property can be reached now, after the taking by the Commission, is from a point on the relocated Brightseat Road * * * about eighty-five (85) feet back from the intersection with Central Avenue. It is now necessary to cross from new Brightseat Road over a drainage pipe onto the property and drive south towards Central Avenue in order to reach the building.

"There is no parking in front of the building along Central Avenue due to a 6 foot high chain link fence which was installed in front of the building by the Commission at distances varying from 3 to 6 feet from the building. Before the taking, cars could turn directly from Central Avenue onto the parking area in front of the building * * *. Cars using Brightseat Road could have either parked alongside the building on Brightseat Road, or pulled in front of the building on Central Avenue."

* * *

"The lease of the * * * [entire tract] and [the] building from Armstrong to Sholom was for 5 years from March 22, 1959 to March 22, 1964 at $150.00 per month.

"There was also in the lease, two additional 5-year options given to Sholom, which provided that Sholom could lease from March 1964 to March 1969 at $275.00 per month, and from March 1969 to March 1974 at $400.00 per month."

* * *

"The lease also gave Sholom an option to purchase

the property during the first 5 year lease term; for $65,000.00 and specified the terms of purchase.

"There was no provision in the lease abating or reducing Sholom's rent in the event of condemnation damage to its leasehold interest."

The Commission offered testimony that the highest, best and most profitable use of the property, both before and after the taking, was for commercial purposes, and that Sholom had no compensable leasehold interest.

"Sholom entered the property under the lease in March 1959 and paid the rent * * * during the first 5-year term. The actual date of taking by the Commission was on November 21, 1962. Sholom notified Armstrong that it was exercising its option to purchase the property during the first 5 years of the lease, before the Commission started construction on the property. Mr. Schrier, president of Sholom, and manager of the premises, testified that Sholom did not complete the exercise of its option to purchase after they realized what the denial of access * * * [along Central Avenue] would do to the value of the property; and he testified that Sholom would have exercised the option to buy but for the taking.

"Schrier also testified that Sholom did not exercise its option to renew the lease for another 5 years in March of 1964 because the denial of access hurt the business. He testified that but for the denial of access * * *, Sholom would have exercised its option to renew the lease.

"Sholom did continue to stay in the property, and pay rent to Armstrong after the end of the first term in March of 1964, and was still a tenant at the time of the trial in May, 1966, on a month-to-month basis.

"The Court refused to permit Sholom's appraiser, William T. Bowers, from giving his opinion as to the fair market value before, and after, the taking by the Commission, of the 2nd and 3rd 5-year leasehold options. It was the position of the Court that Sholom

had not exercised the options to lease the 2nd and 3rd terms and therefore did not have a compensable interest as to them. Sholom proffered their appraiser's testimony that damage to the leasehold interest for the 2nd and 3rd 5-year terms at present discounted values would be $32,396.

"The Court refused to permit Schrier to testify as to his opinion of the fair market value of the property, because Sholom had not exercised its option to buy the property. Likewise, the Court refused to permit Sholom's appraiser, Bowers, from giving his opinion as to the before and after taking values of the option to buy, because Sholom did not exercise the option to buy. Sholom proffered their appraiser's testimony that damages to the option to buy was $43,000.

"The jury awarded $34,000 as total condemnation damages to the defendants, of which $30,500 was to the lessor, Armstrong, and $3,500 was to the lessee Sholom. The lessee has appealed from the judgment; both as to the amount of the total award and as to the manner in which the award was apportioned between the lessor and lessee."

The parties agree and it is settled law that the interest of a lessee in land, in most instances, is compensable. Whether, in reckoning the amount of its compensation, the quantum of Sholom's interest must be limited to 5 years or extended to the full 15 years is the question to be resolved. In 29 A, C.J.S., *Eminent Domain,* § 143, at 617, it is said:

"Generally, the lessee is entitled to the value of an option of renewal in addition to the value of the unexpired term of the lease. So, if there is a covenant for renewal of the term, and such covenant at the rent reserved will add to the value of the tenant's interest, such value should be allowed in addition to the present value of the term, but a mere expectation of such renewal of the lease will give no claim to compensation. There is no certain and exact rule for measuring damages where an option to renew a lease is

impaired or diminished in value due to a condemnor taking a portion of a leasehold estate, since in each case variable factors must be taken into consideration by the court."

To the same effect see 1 Orgel On Valuation Under Eminent Domain, § 121 at 525, n. 88; *United States v. Petty Motor Co., 327 U. S. 372, 380-81 (1946).* While the question has not been presented, except obliquely, to this Court, there are some indications of a leaning in the direction of the general rule as stated in C.J.S., *supra.* In *Mayor, etc. of Baltimore v. Rice, 73 Md. 307, 311-13, 21 Atl. 181 (1891),* Rice was the lessee of a brickyard belonging to the heirs of Charles Carroll. Although his term was for a year only it had always been renewed and the owners' agent testified he would have continued to renew it. Rice had made expensive improvements to the freehold and there was testimony his interest was worth $4,000. The Court said:

"In this State no man's property can be taken for public use before he is paid the value of it. The evidence tended to show that Rice's brick-yard, though held by a precarious tenure, had a large market value."

\* \* \*

"It, however, is not in all respects technically accurate in describing Rice's interest as a tenancy from year to year. *The jury had a right to consider the probability of a renewal of Rice's term,* because the evidence tended to show that this circumstance increased its market value." (Emphasis supplied.)

In *Veirs v. State Roads Commission, 217 Md. 545, 554, 143 A. 2d 613 (1958),* Chief Judge Brune, for the Court, said:

"We think that the instruction limiting the extent of Veirs' recovery to a period less than that of the unexpired portion of his lease was erroneous, because it assumes that the cancellation of the lease of itself resulted in an assignment to the Godfreys of Veirs' interest in the award for the period after the date of

cancellation. This, we think, does not necessarily follow, and therefore the judgment should be reversed."

Although the parties have agreed "that but for the denial of access Sholom would have exercised its options to renew the lease," the trial judge took the position that because "Sholom had not exercised the options * * * it did not have a compensable interest as to them." We think that, in these circumstances, it is immaterial that the right to renew had not been exercised. In *Land Clearance for Redevelop. Corp. v. Doernhoefer*, 389 S. W. 2d 780, 785-86 (Mo. 1965), after pointing out that "lessors' own experts freely conceded the undisputed fact that the lease had substantial value in excess of the contract rental" the court went on to say:

> "Lessors' next point is that the judgment was excessive for the reason that the court allowed lessee full value for the *unexercised option* to renew for an additional term of 10 years. They say there was no evidence to support the judgment insofar as it makes an allowance for the period; that the evidence showed that the renewal option was of little or no value and that *in any event an unexercised option to renew a lease being condemned for public use constitutes no interest in property for which a lessee is entitled to compensation.*
>
> "In our judgment the circuit court properly allowed lessee a bonus value for the full 10-year renewal period in addition to a bonus value for the unexpired 7½ years of the original term. *The holder of an option to renew a lease has an interest in the land.* 'The right of renewal constitutes a part of the tenant's interest in the land, and forms a substantial and integral part of the agreement, * * *.' 51 C.J.S. Landlord and Tenant § 56, p. 596; Taylor's Landlord and Tenant, 9th Ed., Vol I, § 332; Penilla v. Gerstenkorn, 86 Cal. App. 668, 261 P. 488. It is a part of the estate granted, City Garage & Sales Co. v. Ballenger, 214 Ala. 516, 108 So. 257; 'an interest in or encumbrance on the property.' United States v. Certain Par-

cels of Land, D.C. 55 F. Supp. 257, 264. The provision for the 10-year renewal period is 'as much a part of the lease as any other element therein.' Wright v. Logan, Mo. App., 18 S. W. 2d 102, 105. *The option to renew is a right of value, entitled to constitutional protection. Lessee is entitled to the value of an option for renewal in addition to the value of the unexpired term of the lease.*" (Emphasis supplied.)

In *Canterbury Realty Co. v. Ives,* 216 A. 2d 426, 430 (Conn. 1966), it was said:

"The terms of the lease make it clear, however, that the lessor had no right to terminate the lease on either March 1, 1958, or March 1, 1978. Saidel, on the other hand, had the right to renew the lease at any time up to sixty days before the expiration of the ten-year term, or, in other words, until January 1, 1968. In the event that he exercised that option, he then had two additional renewal options open. On June 14, 1962, when the taking occurred, the original term of the lease had nearly six years to run with the possibility, if the options were exercised, of an extension of fifteen years more.

"In approving the referee's conclusion that Saidel's lease was of *no value because the option to renew had not been exercised before the taking, the court was in error*. Every kind of right or interest in property which has a market value must be compensated for in condemnation proceedings. [Citing cases.] Saidel, as lessee, was entitled to receive, as nearly as possible, a fair equivalent in money for the loss of his lease. [Citing cases.] In a determination of what this amount should be, all elements legitimately affecting the value of the lease should be considered. [Citing cases.] The renewal options which, if exercised, would serve to convert the lease from one having nearly six years left to run into one having nearly twenty-one years of potential life were, therefore, elements properly to be considered in a determination of the value of the lease.

[Citing cases.] Since these elements were not considered in the evaluation of Saidel's lease, the case must be remanded for further proceedings." (Emphasis supplied.)

See also *In re Port of New York Authority*, 2 N. Y. 2d 296, 159 N. Y. S. 2d 825 (1957).

The question arising out of Sholom's option to purchase appears to be one of first impression in this Court and it is troublesome, to be sure. Sholom readily concedes that, except in unusual circumstances, which do not exist here, it would not be entitled to the cumulative value of both the option to renew and the option to buy. As between the two it agrees it must fish or cut bait.

It is generally held that a lessee with an option to purchase the premises is not entitled to compensation for his option where it was not exercised prior to the taking. 29 A, C.J.S., *Eminent Domain*, § 196. There are cases, however, which hold to the contrary and, in our judgment, they have greater appeal.

The United States was the condemning party in *Nicholson v. Weaver*, 194 F. 2d 804, 807 (9th Cir. 1952). Nicholson, the lessee of Weaver, had the right to purchase the land at any time during the 10 year lease for $4,000. He alleged the value of the property to be $9,500 and he claimed any amount in excess of $4,000. The jury declared the value of the property in its entirety to be $7,000 which was awarded to Weaver. In reversing the trial judge, the Court of Appeals said:

"A chief factor in evaluating Nicholson's interest at the time of its taking by the Government was his existent sole and exclusive right under the express terms of the lease to purchase Parcel Eight for $4000. at the very time that it had a market value of $7000., as authoritatively found and fixed by the jury in the condemnation action. This right became vested on October 16, 1944, and remains intact as a compensable interest in the fund provided as compensation for the taking of Parcel Eight and all interests therein.

"When the lease containing the option to purchase

covenant was taken by the Government it still had about eighteen months to run before all contractual rights and obligations between the lessor and lessee thereunder terminated. The action of the condemnor did not abrogate such rights. It operated to transfer the potency of them from Parcel Eight to the compensatory fund or award. Phillips v. United States, 7 Cir., 151 F. 2d 645 ; Eagle Lake Improvement Co. v. United States, 5 Cir., 160 F. 2d 182."

The optionee was not a lessee in *In Re Petition of Governor Mifflin Joint School Authority*, 401 Pa. 387, 164 A. 2d 221 (1960). The land was subject to zoning regulations restricting its use to residential purposes only which, it was understood and agreed, was unsatisfactory to Synes, the optionee. If rezoning efforts failed, the agreement provided, Synes had the option to buy or get back the $9,000 he had paid when the agreement was signed. The rezoning efforts did fail. In the ensuing condemnation proceeding the court denied Synes' claim for damages. The Supreme Court of Pennsylvania reversed the lower court, saying:

"* * * Despite the failure to rezone, Synes had never elected to purchase. Not having elected to purchase, he did not accept the offer implicit in the option, the offer by Hughes to sell. The agreement between Hughes and Synes was not, therefore, sufficient in law to work an equitable conversion of the realty in question. Consequently, legal and equitable title to the land remained in Hughes and Son, Inc.

"However, a claim by appellant [Synes] is also made against appellee Authority for damages sustained by him because of the loss of his right to elect to purchase. In other words, as of the date of condemnation, Synes could still have hoped, but for the condemnation, for a future rezoning. In lieu of a reclassification, he could nevertheless have elected to purchase. But the condemnation prevented this and, therefore, destroyed a valuable right he possessed. At the trial, he repeatedly attempted to offer testimony with

respect to the value of the land. This was rejected because he lacked title to the premises. He was advised that he could give testimony with respect to the value of the *option* he had held and which the condemnation had destroyed. The lower court concluded that Synes should receive nothing for this loss because (1) by accepting the return of his purchase money 'down payment,' he had elected to consider the agreement void and (2) he adduced no proof at the trial of its worth. We cannot agree that the acceptance of the return of the $9,000 down payment worked an election to cancel the agreement. His acceptance of this money took place a considerable time after the act of condemnation. Furthermore, the condemnation of the property having made an affirmative exercise of the option impossible in any event, appellant could do little else but get his money back. He didn't elect to purchase, it is true; but he didn't elect to cancel, either. The condemnation caused the loss of his right to elect to purchase. Surely, this must have possessed some value—it took a $9,000 down payment to secure it!" *Id.* at 224.

It must not be supposed that our discussion of *In Re Petition of Governor Mifflin, supra,* amounts to a holding that the owner of a bare unexercised option to buy has a compensable interest in a condemnation proceeding against the owner of record. That question is not now before us. Sholom's option to buy, it will be recalled, is ancillary to its interest in the property as a lessee and as the court said in *Land Clearance, supra*:

"The holder of an unexercised option *to renew* a lease, having an interest in the land, is in a different position from that of the holder of an option to purchase who has *no interest in the land* before the exercise of the option." *Id.* at 786.

Nonetheless, while we do not adopt the holding in *In Re Petition of Governor Mifflin,* we think that court's opinion provides a measure of persuasive support for our holding in the case at bar.

We think Sholom is entitled to produce testimony either in support of the value of a 15 year lease or in support of its option to buy. If Sholom elects to pursue the value of its lease, then, it seems to us, the option to buy must be abandoned because it could have been exercised only during the first five years. If it undertakes to pin its hopes on the option to buy, then, obviously, it must let the renewals of the lease go by the board.

Sholom also importunes us to say that it was reversible error for the trial judge to refuse "to permit Sholom to prove the relationship between the road construction * * * and the destruction of the septic system." The Commission acknowledged some damage to the system by reason of the taking and agreed that the sum of $800 should be considered by the jury in assessing the damages. The cost of repairing the septic system (over and above the $800) was acknowledged to be $1,495. However, since this damage was caused by the contractor's operations on Sholom's property, it is to the contractor Sholom must look for recompense—not the Commission.

Armstrong acknowledges being in the "peculiar position" of agreeing with Sholom's contention in respect of the renewal terms of the lease. There is nothing "peculiar" about his position, however, unless enlightened self-interest can be said to be "peculiar." Armstrong invites our attention to *Gluck v. Mayor & City Council of Baltimore,* 81 Md. 315, 320-21, 32 Atl. 515 (1895), wherein our predecessors observed:

> "The owner of the leasehold, and the owner of the reversion, together hold the fee-simple estate. Each has a distinct estate of property. * * * Whatever be the method of ascertaining the values of these distinct interests, it is evident that the *sum of those values* must be the full value of the property taken." (Emphasis supplied.)

And to *Mayor & City Council of Baltimore v. Gamse,* 132 Md. 290, 293, 104 Atl. 429 (1918), where it was said:

> "The appellees, as owners of the leasehold, and the City, as owner of the reversion * * *, together held

the fee simple estate, *and the sum of the values of these interests is the value of the property taken.*" (Emphasis supplied.)

The Commission earnestly contends that the proper approach is to value the property as though the entire title is vested in one person and then apportion the award among the contending interests. *Mayor and City Council of Baltimore v. Latrobe,* 101 Md. 621, 61 Atl. 203 (1905). While tacitly conceding that Sholom may be entitled to a larger slice of the pie the Commission contends that the size of the pie ($34,000) has already been established. Armstrong, on the other hand, says that the sum of the slices should determine the size of the pie, anticipating, no doubt, the likelihood that an increase in the value of Sholom's slice may result in a proportionate increase in the value of his share of the pie. Since, as we have said, the possible effect of Sholom's options to renew on the value of its leasehold interest was erroneously excluded we cannot agree that the size of the pie should be accepted and merely re-sliced. If it can be said that there is a general rule demanding the valuation of the entire estate before apportionment to the respective interests therein, one must also take into account how that general rule may have been eroded by our holdings in *Latrobe, supra* and *State Roads Comm. v. Novosel,* 203 Md. 619, 102 A. 2d 563 (1954). See also *U. S. v. Certain Parcels of Land,* 43 F. Supp. 687 (D. C. Md. 1942).

We think the language of Mr. Justice Holmes in *Boston Chamber of Commerce v. Boston,* 217 U. S. 189, 195 (1910) is a reasonably accurate crystallization of all of the past statements of this Court in this regard:

"* * * [T]he Constitution does not require a disregard of the mode of ownership—of the state of the title. It does not require a parcel of land to be valued as an unencumbered whole when it is not held as an unencumbered whole. It merely requires that an owner of property taken should be paid for what is taken from him. It deals with persons, not with tracts of land. And the question is what has the owner lost, not what has the taker gained."

The judgment of the trial court will be reversed and the case

will be remanded for further proceedings consistent with the views expressed herein.

*Judgment reversed.*

*Case remanded for further proceedings consistent with the views expressed in this opinion.*

*Costs to be paid by the State Roads Commission.*