MOUNT JUNEAU ENTERPRISES, INC., Alaska Trams, Inc., Arnt I. Antonsen, and Charles Keen and Karen Keen, Appellants,

v.

The CITY AND BOROUGH OF JUNEAU, a Municipal Corporation, Bruce Botelho, Caren Robinson, Rosalee T. Walker, Kim S. Elton, Dennis W. Egan, Rosie Peterson, Errol Champion, George Davidson, John MacKinnon, Kevin Ritchie, Barbara Blasco, and Murray Walsh, Appellees.

No. S–6611.

Supreme Court of Alaska.

Sept. 6, 1996.

Rehearing Denied Nov. 20, 1996.

Phillip Paul Weidner, Weidner & Associates, Inc., Anchorage, for Appellants.

Avrum M. Gross and Susan A. Burke, Gross & Burke, Juneau, for Appellees.

Before RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

### I. INTRODUCTION

This appeal involves an interwoven property right and contractual dispute surrounding a failed attempt by Charles Keen to construct a tram to the top of Mount Juneau.

### II. FACTS AND PROCEEDINGS

There are two separate sets of facts underlying the issues of this appeal, those relating to the tunnel claim and those relating to the tram claims.

#### A. The Tunnel Claim

In 1913, the Alaska Juneau Gold Mining Company (AJ) obtained an easement to construct and maintain a tunnel underneath the Red Jacket and White Wing mining claims. The easement granted AJ, "its successors and assigns forever, the right to drive, construct and maintain" a 9′ by 14′ tunnel under the Red Jacket and White Wing mining claims to enable the AJ "to construct and perpetually maintain a transit tunnel in and through which to lay water pipes, flumes and other conduits for the purpose of conveying water...." The tunnel connected the two already existing ends of what is known as "Tunnel No. 3."

On January 3, 1974, AJ Industries conveyed its rights in the tunnel to the Alaska Electric Light & Power Company (AEL & P) by a statutory quitclaim deed. That June, AEL & P granted the City and Borough of Juneau (City) a permanent easement specifically authorizing the City to use the tunnel for "the transmission and storage of water." From September 1977 to April 1979, contractors for the City worked to convert the tunnel into a public water reservoir. The entire project was accepted as complete on November 1, 1979; however, additional work continued until May 1982.

Sometime in 1972, Charles Keen became interested in purchasing the Red Jacket and White Wing mining claims overlying the tunnel. He contacted Leonard Idso, who was paying taxes on the property at the time, and apparently obtained an option to purchase the property. The first record of Keen's interest in the property is an earnest money agreement, dated October 5, 1981, between Keen and Idso for the sale of property including the Red Jacket and White Wing mining claims. The agreement provides that the purchase price for the two mining claims, as well as a third mining claim, was $10,000. The agreement also states that the real property was to be conveyed subject to "easements of record." A statutory warranty deed from Idso to Charles and Karen Keen for the three mining claims was executed on October 16, 1981, and on October 22, 1981, the Keens quitclaimed their interest to Alaska Trams, Inc.

Keen testified in his deposition that he first learned of the City's use of the tunnel either just prior to or immediately after his purchase.[1] Keen testified that, at some time after the purchase, he and his wife saw a map at the municipal building showing the City's use of the tunnel. He advised the City that a mistake had been made and thereafter took the position that the City was trespassing on his property.

## B. *The Tram Claims*

In 1976, the City became involved in Keen's plans to build a tram to the top of Mount Juneau. The first plan called for a tramway from a base terminal on South Franklin Street to the top of Mount Juneau with a mid-point tower on Gastineau Ridge. The City leased a piece of land on Gastineau Ridge to Alaska Trams for the mid-point tower and issued a conditional use permit that would allow the construction. In 1978, the City sold Keen some land on South Franklin Street to be used for the base terminal. The deed of sale contained a reversion clause providing that the City could repurchase the land if it was not used to develop the tram within four years. The deadline, however, was extended several times. In 1984, the City modified its procedures and required contractors with conditional use permits to secure building permits and begin construction within 18 months. Keen applied for a new permit, set to expire in February 1986, based on the same plan outlined in 1976.

On February 25, 1985, Keen offered to waive all of his potential tunnel claims against the City if the City would deed him the property he already owned on South Franklin Street free of the reversion clause, deed him the land owned by the City on Gastineau Ridge and at that time leased to Keen for the mid-point towers, grant him certain air rights over City property, and "road deed access and parking space ... over City property" to his mining claims. After an initial ordinance reflecting the terms of this settlement was debated and rejected by the Assembly, a new ordinance reflecting similar terms, Ordinance No. 85–53am, was introduced and passed. The provision required Keen to submit surveys describing the as yet unspecified location, extent and scope of the easements for the road and the parking lot "at a location and size to be approved by staff in accordance with existing planning and zoning standards."

At the time Ordinance 85–53am was adopted, Keen's conditional use permit authorized the placement of mid-point towers on Gastineau Ridge. However, Keen then

---

1. In the late 70s, Keen learned that the City was converting a tunnel into a water reservoir. He claimed that he contacted City officials but was assured that the tunnel being converted was not the same tunnel he was interested in purchasing.

decided to change the plans for the tram due to a dispute over air rights. Instead of having the tram begin on South Franklin Street, the new plan located the base of the tram on one of Keen's mining claims in Gold Creek Basin. In August of 1985, the City apparently concluded that the new plan would have to be evaluated by the Planning Commission and that Keen would have to proceed through the conditional use permit procedure. Keen's representative was subsequently informed that the new plan would require a zoning change and a new conditional use permit.

In late 1986, the City Manager requested Keen to provide the survey required under Ordinance 85–53am. Specifically, he noted that the granting of an easement "for a road and parking lot over city and borough property connecting Red Jacket, White Wing, and Black Diamond mining claims to the nearest existing road" was conditioned on Keen "providing the manager with a stamped survey, describing the location, scope and extent of the easement at a location and size to be approved by staff in accordance with existing planning and zoning standards."

Keen eventually applied for a zoning change for the land near his mining claims. However, because of numerous problems identified with that plan, Keen and the City agreed to come up with an alternative plan. Under the alternative plan, the base terminal would be located on South Franklin Street as envisioned by the original plan, but it would be located on City land to avoid any dispute over air rights. The City issued a new conditional use permit for this plan in April of 1987.

Keen's representatives and the City worked to prepare Ordinance No. 87–30 which provided for the conveyance of City land on South Franklin Street to Keen in exchange for Keen's release of his tunnel trespass claims against the City. The ordinance was hotly debated at the Assembly meeting on May 4, 1987, and it ran into heavy public opposition due in part to the lack of an appraisal value for the tunnel claim. The ordinance was defeated by a 4 to 3 vote of the Assembly.

In the meantime, several events of importance were taking place. First, in mid–1986, Alaska Trams filed for Chapter 11 bankruptcy. Second, City attorneys interpreted Ordinance No. 85–53am simply as an ordinance designed to settle the tunnel claims by authorizing the City Manager to negotiate a settlement and to transfer City land as part of the deal. Keen, on the other hand, had always contended that the ordinance was a binding contract. Third, City attorneys and some City assembly members were concerned that Keen's tunnel claim was worthless and an appraisal was eventually ordered to value the claim.

Keen's representatives and the City subsequently began to work on Ordinance No. 87–34 to address the problems which led to the defeat of Ordinance No. 87–30. The appraisal, received prior to the Assembly's final action on Ordinance No. 87–34, concluded that the tunnel claim was valueless. Thus, the Assembly directed City staff to remove certain reversion and repurchase provisions in Ordinance No. 87–34 and to provide for the sale of City land at fair market value subject to a discount to reflect the litigation value of Keen's claim. This version of the ordinance was passed by the Assembly.

Keen did not support this ordinance and refused to negotiate a credit for settling the tunnel claim. Keen approached the City and requested that the land transfer be separated from the issues surrounding the tunnel claim. The Assembly then passed Ordinance No. 88–03 which authorized conveyance of the property to Alaska Trams for an established price without requiring him to compromise the tunnel claim. The ordinance also required Keen to undertake certain actions before obtaining title to the property, including providing necessary surveys. These conditions were to be met by December 5, 1988, but due to delays, the land transfer was not completed until July 12, 1989.

In the meantime, the 1987 conditional use permit was set to expire in October of 1988. Prior to the expiration, Keen applied for and was granted a "fast track authorization" permit (FTA) that would allow him to build the project in phases. The permit required the work to commence by April 28, 1989, and

that "construction activity shall continue without interruption until all work of the lower and mid terminal lower tram is accomplished."

No work was commenced prior to April 28, 1989 and the starting date was extended until October 9, 1989. Work commenced prior to that date and continued sporadically until the spring of 1990. On October 29, 1990, Keen and City staff agreed to the conditions under which the FTA would be continued in force even though Keen's work on the project had stopped. Specifically, Keen agreed to provide insurance to cover damages to adjoining landowners and to provide a written guarantee from a reputable contractor that if Keen did not complete the lower retaining wall by April 30, 1991, the contractor would do so. Keen failed to deliver the insurance and guarantee, and the City set a January 22, 1991 deadline for Keen's performance of the agreement.

At about this time, the Alaska Trams bankruptcy was converted into an involuntary Chapter 7 proceeding, and the City began to deal with the bankruptcy trustee. The City extended the insurance coverage and building commitment deadline until February 1, 1991 at the request of the bankruptcy trustee. The insurance was then finally posted and a contractor signed an agreement to complete the work if Keen failed to complete it. However, the contractor's guarantee was conditioned on Mount Juneau Enterprises' retaining the building permits.

On January 25, 1991, the City Manager, Kevin Ritchie, was interviewed by a radio reporter. Ritchie stated that he could not think of a good reason to extend the permit past its last expiration date for Keen, but that the City would cooperate with the bankruptcy trustee. The City and the bankruptcy trustee began to discuss the status of the permit. The City informed the trustee that if the project was cancelled for reasons beyond Alaska Trams' control, the City would be able to refund $27,000 of the unexpended

building permit fees to the bankruptcy estate. The trustee subsequently informed the City that the project was cancelled.

Mount Juneau Enterprises immediately objected to the cancellation, and filed a motion before the bankruptcy court seeking to enjoin the trustee from cancelling the project. A hearing was held on March 8, 1991. The bankruptcy judge refused to enter an order, but ruled that the trustee had not effectively cancelled the project, and that the proper procedure to follow for cancellation of the project was to move for abandonment.

Immediately after the hearing, the City Manager wrote to Keen and the Assembly advising them of the judge's ruling and stating that the City would determine whether all the conditions of the building permit had been satisfactorily met. He invited Keen to meet with him and discuss the matter. A meeting was held.[2] The City agreed to confirm in writing that the permit was valid, and extended the time period within which Keen was to complete the retaining wall until May 31, 1991.

However, Keen did not comply with the new deadline, and on June 23, 1991, he filed this suit against the City. Counts 1 through 5 of Mount Juneau Enterprises' complaint concerned the tunnel claim and included a claim for damages for trespass. Counts 6 through 13 concerned the tram claims and included claims for damages for breach of contract and fraud. The City subsequently informed Keen that the permit had expired.

After extensive discovery, both parties moved for summary judgment. Following oral argument, the superior court concluded that there were no issues of material fact concerning any of the claims and entered final judgment in favor of the City. Mount Juneau Enterprises appeals.

### III. STANDARD OF REVIEW

■ This is an appeal from the superior court's grant of summary judgment in favor of the City. In reviewing a grant of summary

---

2. The meeting was apparently very difficult. Keen believed that Ritchie's statements to a radio reporter and newspaper had effectively ended his hopes for financing and caused great injury to the tram project. Keen apparently stated that he would not attempt to resolve the matter unless the City took out a full page newspaper ad apologizing to him. No such ad, however, was ever run by the City.

judgment, this court applies a *de novo* standard of review and determines whether there are any genuine issues of material fact, and whether the moving party is entitled to judgment on the law applicable to the established facts. *Farmer v. State*, 788 P.2d 43, 46 n. 8 (Alaska 1990); *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985).

■ Mount Juneau Enterprises also appeals the superior court's denial of a motion to continue discovery under Civil Rule 56(f). This court reviews a trial court's decision on whether to permit further discovery under Civil Rule 56(f) for an abuse of discretion. *Munn v. Bristol Bay Housing Auth.*, 777 P.2d 188, 192 (Alaska 1989).

## IV. DISCUSSION

### A. The Tunnel Claim

The superior court concluded that the City had acquired title to the tunnel through inverse condemnation, that the condemnation had occurred before Keen obtained any interest in the tunnel and, accordingly, denied Keen's claims for damages for trespass or condemnation for a taking of property. On appeal, Keen argues that the superior court erred in determining that the City had inversely condemned the tunnel. Keen also argues that, even if the City had inversely condemned the tunnel, he has a right to compensation by virtue of his option to purchase.

### 1. Trespass Damages

■ Subsections (4) and (5) of AS 09.55.240(a) provide that municipalities may use the power of eminent domain to condemn "sites for reservoirs necessary for collecting and storing water." An inverse condemnation occurs when a governmental entity takes private property for public purposes under the good-faith but mistaken belief that the taking does not require the exercise of eminent domain. *State, Department of Highways v. Crosby*, 410 P.2d 724, 728–29 (Alaska 1966).

■ The doctrine of inverse condemnation was the basis of this court's decision in *Wickwire v. City & Borough of Juneau*, 557 P.2d 783 (Alaska 1976). In *Wickwire*, the City mistakenly placed a sewer line on Wickwire's property. Although Wickwire asserted a trespass claim, as did Mount Juneau Enterprises in this case, we concluded that the landowner's only remedy in such a case "is an inverse condemnation action for just compensation for the value of the easement on the date of taking...." *Id.* at 784.

Keen's only argument that no inverse condemnation took place in this case is that the City's belief that it owned an easement sufficient to construct the reservoir was not a good-faith belief since a title search would have revealed that AEL & P did not have the power to convey this interest. We do not agree that the City's reliance on AEL & P's easement is inconsistent with a good-faith but mistaken belief that there was no need to exercise eminent domain powers. Accordingly, we conclude that the City inversely condemned the tunnel sometime in the mid-1970s and that Mount Juneau Enterprises could not, therefore, be entitled to damages for trespass.

### 2. Compensation for Inverse Condemnation

■ Generally, "when there is a taking of property by eminent domain in compliance with the law, it is the owner of the property *at the time of the taking* who is entitled to compensation." 2 Sackman, *Nichols on The Law of Eminent Domain* § 5.01[4], at 5–29 (Rev.3d ed.1993).[3] This right is a personal one which does not pass to a subsequent purchaser unless the parties explicitly agree to that arrangement. *Wickwire*, 557 P.2d at 785 n. 7; *see also Williams v. City of Valdez*, 624 P.2d 820, 821 (Alaska 1981). The agreement signed by Keen and Idso in 1981 nowhere provides for such a transfer. Since Keen was not the owner of the property on the date of the taking and did not receive any right of action against the government in his

---

**3.** *Wickwire* defines the date of the taking as the date when the construction began. 557 P.2d at 784 n. 4.

deed, he is not entitled to compensation as the owner of this easement.

For purposes of this appeal, however, we must assume that Keen had an option to purchase the claims at the time that the City commenced construction of the reservoir, and we must consider the significance of this option. There is a recent trend favoring "the conclusion that the owner of an unexercised option to purchase land possesses a property right which is compensable in eminent domain...." 2 Sackman, § 5.03[1], at 5–72 and 5–73. The leading case taking this approach is *County of San Diego v. Miller*, 13 Cal.3d 684, 119 Cal.Rptr. 491, 532 P.2d 139 (1975), in which the California Supreme Court held that the owner of an unexercised option to purchase land possesses a property right which is a compensable interest in a condemnation action. To this effect, the *Miller* court stated as follows:

[C]ompensation issues should be decided on considerations of fairness and public policy. "The constitutional requirement of just compensation derives as much content from the basic equitable principles of fairness of property law." "[T]he right to compensation is to be determined by whether the condemnation has deprived claimant of a valuable right rather than by whether his right can technically be called an 'estate' or 'interest' in the land."

*Miller*, 119 Cal.Rptr. at 495, 532 P.2d at 143 (citations and emphasis omitted). The court held that the measure of damages to the optionee is the excess, if any, of the total award above the optioned purchase price.[4] *Id.*, 119 Cal.Rptr. at 496, 532 P.2d at 144.

Although we agree that an option does create a compensable interest in property and that, in some cases, an option-holder may be entitled to some proceeds from an inverse condemnation action, Keen's allega-

tions in this case are simply not sufficient to support such a claim. In his affidavit, Keen stated as follows:

I can state with certainty that I purchased this option in 1971 or 1972. I do not remember the amount I paid for the option. I did not keep a copy of this option. My wife and I are not sophisticated bookkeepers and at the time I had no idea that the option agreement would become an important document. In 1981 when we exercised the option to purchase and received a warranty deed we did not believe the option agreement was necessary to keep anymore.

The fact that Keen held some kind of an option to purchase the land in question is not alone sufficient to entitle him to compensation. The proper inquiry should focus on the extent to which his option diminished in value as a result of the City's actions. In order to calculate this amount, Keen would have to introduce the terms of the option itself with adequate specificity; he has failed to do so.

Without any evidence of the terms of the option, it is impossible to determine whether the condemnation has deprived Keen of a valuable right, thus warranting compensation. *See Miller*, 119 Cal.Rptr. at 495, 532 P.2d at 143. If, for example, the option allowed Keen to purchase the property at a price of one dollar at any time before the year 2000, the option may have diminished in value as a result of the City's actions to nearly the full extent of the value of the taking. On the other hand, if the option was merely a right of first refusal, the diminution of value would probably be negligible.[5]

Because Mount Juneau Enterprises can neither produce the option agreement nor any evidence of its terms, it has failed to raise a material fact as to whether the con-

---

4. This approach has been adopted by a number of states. *Texaco, Inc. v. Commissioner of Transportation*, 34 Conn.Supp. 194, 383 A.2d 1060 (1977); *Sholom, Inc. v. State Roads Comm'n*, 246 Md. 688, 229 A.2d 576 (1967); *State v. Las Vegas Bldg. Materials, Inc.*, 104 Nev. 479, 761 P.2d 843 (1988); *Fullington v. M. Penn Phillips Co.*, 238 Or. 321, 395 P.2d 124 (1964); *In re Petitioner of Governor Mifflin Joint School Auth.*, 401 Pa. 387, 164 A.2d 221 (1960); *Spokane School Dist. No.*

*81 v. Parzybok*, 96 Wash.2d 95, 633 P.2d 1324 (1981).

5. In a supporting affidavit, Robert Slatzer described the option as "a hand-written document which was an *option of first refusal* to purchase the land on which the tunnel was located." (Emphasis added). Although he had a copy of the option in his possession, Slatzer is apparently unable to recall any of the specific terms.

demnation deprived Keen of a valuable right.[6] *See Alaska–Canadian Corp. v. Ancow Corp.*, 434 P.2d 534, 537–38 (Alaska 1967). Based on the foregoing, we conclude that summary judgment was appropriate as to the tunnel claim.[7]

## B. *The Tram Claims*

### 1. *Ordinance No. 85–53am*

The superior court concluded that Ordinance No. 85–53am established certain rights and duties in the City and Alaska Trams, but that the City did not violate the terms of the ordinance. To this effect, the superior court stated:

> There is no legitimate issue in dispute on this claim. Alaska Trams was required, as a condition precedent to the City's performance, to provide a stamped survey showing the location and size of the easement that could be approved by City staff in accordance with planning and zoning ordinances. This was never done. . . .
>
> A new route was planned and eventually land transferred and work begun. There is no breach by the City, or by Alaska Trams for that matter concerning the new plan. The parties just agreed to do something else.

On appeal, Mount Juneau Enterprises argues that the City breached the contract embodied in Ordinance No. 85–53am.

Ordinance No. 85–53am authorized the City Manager to transfer certain City land to Keen in exchange for Keen's abandoning the tunnel claim against the City. Part of the property to be conveyed was described in Section 3(a) of the ordinance, which stated as follows:

> Section 3. Land and Easement Conveyances. In exchange for a conveyance

by Chuck Keen as representative of Alaska Trams of an unrestricted easement, in perpetuity, consisting of Water Tunnel No. 3 so that the City and Borough of Juneau may continue its existing use of the tunnel as a water reservoir, the manager is authorized to convey to Chuck Keen:

> (a) an easement for a road and parking lot over city and borough property connecting Red Jacket, White Wing and Black Diamond mining claims to the nearest existing road. The grant of the easement shall be conditioned on Chuck Keen providing the manager with a stamped survey describing the location, scope and extent of the easement at a location and size to be approved by staff in accordance with existing planning and zoning standards.

Keen never provided the City with a stamped survey, and it was eventually determined that Keen was not likely to get the zoning change approved. Thus, Keen and the City agreed to come up with an alternative plan. Since Keen failed to meet the conditions for conveyance of the land in Ordinance No. 85–53am in the first place, the City's actions would not have amounted to a breach even if a contract had been formed.

Mount Juneau Enterprises argues that Ordinance No. 85–53am constituted a binding agreement that the City would transfer land to Keen in exchange for Keen's agreement to abandon the tunnel claim. Such an agreement was based on the assumption that the tunnel claim was valuable. Thus, Mount Juneau Enterprises seems to argue that even though the original agreement had been mutually abandoned, the City was still obligated to treat Keen's tunnel claim as valuable in subsequent negotiations, and to transfer land

---

**6.** The City accurately summarizes the state of the evidence relating to the terms of the option as follows:

> Keen does not remember the date of the option (Keen Dep. at 951); or the terms of the option (Keen Dep. 954, 959–960); or whether he paid anything for the option (Keen Dep. at 1009). He does not remember if the option was written or verbal (Keen Dep. at 952). He does remember that he was not legally obligated to buy the property (Keen Dep. at 954) though he cannot remember whether the owners were obligated to sell. (Keen Dep. at 959–

960.) At one point, he asserted it was a "first refusal option" that would entitle him to a "first refusal" when the family got some legal matters "cleared up." Keen didn't "have a clue" what the legal matters were. (Keen Dep. at 954–55.) Keen cannot remember whether the option could be revoked or, if so, under what circumstances. (Keen Dep. at 973).

**7.** In light of this holding we need not consider the question of whether the City gained title to the easement by adverse possession.

to Keen in exchange for Keen's agreement to abandon the claim. Apparently, the City was supposed to treat the claim as valuable even after determining that it had no value.

The City cites *City of Louisville v. Fiscal Court of Jefferson County*, 623 S.W.2d 219 (Ky.1981) for the proposition that a legislative body may not bind itself to future legislative action. In that case the Supreme Court of Kentucky considered a contract allegedly resolving a dispute over annexation, where the City had agreed to limit certain future tax rates and to cooperate fully with the owners of the annexed property in applications for zoning changes. The court stated as follows:

> The law is clear that a legislative body may not limit its power to act one way or another in the future in governmental as opposed to proprietary, functions.

*Id.* at 224. The court then stated:

> Not only does the contract place an obligation on the city which may create conflicts of interest, but it also creates an obligation to legislate in the future. The area of zone changes, changes in street entrances, flood control, etc., are all legislative in nature. A contract which binds a legislative body, present or future, to a course of legislative action is void against public policy.

*Id.* at 225 (citations omitted).

The conveyance of City land can only be authorized by the Assembly. *See* CBJ Ordinance 53.09.200. Thus, even if Ordinance No. 85–53am constituted a contract providing that the City would both treat Keen's tunnel claim as valuable in the future and transfer land to Keen in exchange for an agreement to abandon it, such a contract would likely be unenforceable because it requires future legislative action. That is, it would require the Assembly to agree in advance to authorize the exchange of unspecified parcels of land in the future.

 Based upon on the foregoing, we conclude that even if Ordinance No. 85–53am did create a contract of some sort between Keen and the City, the City did not violate any enforceable obligations in the course of its negotiations with Keen.[8]

### 2. The Building Permits

 The superior court granted summary judgment in favor of the City on Mount Juneau Enterprises' claims relating to the building permits on three grounds: failure to exhaust administrative remedies, statutory immunity for discretionary acts under AS 09.65.070(d)(2), and statutory immunity for actions relating to building permits under AS 09.65.070(d)(3). On appeal, Mount Juneau Enterprises challenges the superior court's conclusions that it failed to exhaust administrative remedies and that the City had discretionary immunity under AS 09.65.070(d)(2).

In *Ben Lomond, Inc. v. Municipality of Anchorage*, 761 P.2d 119 (Alaska 1988), rather than appealing the revocation of its building permit, Ben Lomond filed suit against the Municipality based on a claim of unconstitutional deprivation of property. We held that the failure to appeal the revocation of a building permit under applicable municipal appeal procedures barred any judicial action for damages based on the revocation. *Id.* at 121–22.

We stated that whether a court should require exhaustion of administrative remedies "turns on an assessment of the benefits obtained through affording an agency an opportunity to review the particular action in dispute." *Id.* at 121. To this effect, we noted that the basic purpose of the doctrine

---

8. Mount Juneau Enterprises also argues that the City should be estopped from denying that Ordinance No. 85–53am constituted a settlement of the tunnel litigation. Estoppel may apply where there is: (1) an assertion of a position by conduct or word; (2) reasonable reliance thereon; and (3) resulting prejudice. *Municipality of Anchorage v. Schneider*, 685 P.2d 94, 97 (Alaska 1984).

It was not reasonable for Keen to rely on Ordinance No. 85–53am when it was Keen who failed to provide the City with the necessary stamped survey. Moreover, Mount Juneau Enterprises argues that Keen and Alaska Trams spent hundreds of thousands of dollars on construction of the tram and that the City "should be estopped from taking away the building permits to gain advantage in the tunnel litigation." However, Keen is the one who let the permit expire on its own terms. Keen's estoppel arguments are without merit.

of exhaustion of administrative remedies is "to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Id.* at 122 (citation omitted).

In *Eufemio v. Kodiak Island Hosp.*, 837 P.2d 95, 98 (Alaska 1992), we held that, in applying the doctrine of exhaustion of administrative remedies, a court must determine the following:

> 1) is exhaustion of remedies required; 2) did the complainant exhaust those remedies; and 3) is the failure to exhaust remedies excused?

The City has an ordinance specifically providing for an independent Board of Appeals to review disputed decisions or orders of the City building official. *See* CBJ Ordinance 19.02.010. The ordinances relating to building permits are contained within that same title.

Since an administrative appeal is clearly provided for, exhaustion of remedies is required in this case. Mount Juneau Enterprises did not avail itself of these appeals provisions. However, Mount Juneau Enterprises argues that the failure to exhaust remedies should be excused because (1) this suit was filed before the final administrative decision was made; (2) the final decision did not provide proper notice of the right to appeal; and (3) an appeal to the Board of Appeals would have been futile.

We find the first and third reasons to be without merit. And as to the second reason, Keen was given actual notice of the existence of the appeal provisions in a letter granting an extension of the FTA in 1989. Accordingly, we find that all claims regarding the building permits are barred as a result of Mount Juneau Enterprises' failure to exhaust its administrative remedies.[9] Since the claims are barred, we need not reach the issue of whether the City is immune from suit under AS 09.65.070(d)(3) or AS 09.65.070(d)(2).

### C. *Further Discovery*

Mount Juneau Enterprises filed a motion before the superior court to stay ruling on the motions for summary judgment pending further discovery under Civil Rule 56(f).[10] The superior court denied the motion because Alaska Trams had sixteen months within which to conduct discovery,[11] Alaska Trams did not file an affidavit as required by the rule, the superior court did not believe that a genuine issue of material fact would emerge from further discovery, and the superior court questioned the diligence of Alaska Trams. Civil Rule 56(f) specifically requires that an affidavit be filed with a motion for further discovery. *See Munn,* 777 P.2d at 192–93; *Jennings v. State,* 566 P.2d 1304, 1313–14 (Alaska 1977).

For the reasons expressed by the superior court, we conclude that it was not an abuse of discretion to deny the motion requesting further discovery.

9. Counts 7 and 8 of Mount Juneau Enterprises' complaint allege breach of contract arising out of the building permits. However, building permits are not contracts. 9A McQuillin, *The Law of Municipal Corporations* § 26.212, at 225 (3d ed.1996). *See also Rehmann v. City of Des Moines,* 204 Iowa 798, 215 N.W. 957, 960 (1927) ("a permit is merely a privilege to do what would otherwise be unlawful, and is not a contract between the authority, federal, state, or municipal, granting it and the person to whom it is granted").

10. Civil Rule 56(f) provides as follows:
> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

11. To this effect, the superior court stated as follows:
> Alaska Trams had sixteen months to conduct discovery in this case. (The suit was filed in June of 1991 and Judge Schulz imposed a stay of discovery in November of 1992.) During that time thousands of pages of documents have been disclosed, numerous depositions have been conducted, alleged privileged materials have been turned over or offered for inspection *in camera.* The deposition of the City's attorney, Barbara Blasco, alone, was close to 1000 pages.

## V. CONCLUSION

The superior court's grant of summary judgment in favor of the City is AFFIRMED in all respects.

MOORE, C.J., and EASTAUGH, J., not participating.